Ruffin, C. J.
 

 As the paper was executed before 1840, attestation was not necessary to its validity as a will of personalty; and probably the presiding Judge would not have allowed a mistake of that kind — arising from a mere
 
 *636
 
 slip of his memory or attention — to prejudice the party, and would have granted a new trial, but (or the desire to have the litigation put into a way to be terminated by having the other points decided. The Court thinks, however, that
 
 the
 
 propounder could not only ask for a new trial, but that he is entitled to a
 
 venire de novo,
 
 for error in that part of the instructions. The propounding of the script, as disposing of both kinds of property, and reading it through to the Court and jury, and insisting in the argument that it was well executed to ail the purposes involved in the issue, it would seem, sufficiently presented the distinction between the execution of wills and testaments, in 1833, to make it incumbent on the Court to inform the jury of the distinction, if the Judge undertook to give any instructions at all on the points of attestation and execution. Although it be not error to refrain from giving instructions, unless they be asked, yet care must be taken, when the Judge thinks it proper, of his own motion or at the party’s, to give them, that they be not in themselves erroneous, or so framed as to mislead thejur}'. .(Such care was not taken here ; for the instruction given, .unaccompanied by any qualification or explanation, rp^y have left, and probably did leave, the jury under the impression, that attestation in the. presence of the party was requisite to give validity to the paper for any purpose, and ■may have prevented it from being sustained as a testament. •
 

 But, upon the other points, the Court also deems the directions erroneous, considered in reference to the evidence, on which-they were given. It is true, the terms, ‘ in the presence,” and “within view,” are considered generally synonimoust because the sight of the testator is the best means of preventing the fraud, within-the province of the. act. But they are not perfectly so; for a blind man may make a will. Besides, as the Court here said, actual view is never necessary, but it is sufficient if
 
 *637
 
 the party might see the witness attest, though in a different as well as in the same room. For, if actual sight were re' quisite, it would vitiate a will, as was mentioned in
 
 Sheers
 
 v.
 
 Glasscock,
 
 1 Salk. 688, if a man did but turn his back' or look off, though literally present by being at the spot' where the thing was done. But when the witnesses attested in the same room in which the testator was lying in bed, it was good, though the curtains of the bed were closed; because it was in his power to see them, and therefore it was construed to be done in his presence.
 
 Davy
 
 &
 
 Nicholas
 
 v.
 
 Smith,
 
 1 Salk. 395. It is not, therefore, the feasibility of obtaining another paper, which will avoid the attestation, when all passes in the same room, so that the party has opportunity of watching for him or herself; for under those circumstances the attestation is
 
 prima facie
 
 good. It is true, it is not to be taken to be conclusively
 
 good. The
 
 Chancellor in
 
 Longford
 
 v. Eyre, 1 Pr. Wms. 740, stated, that the bare subscribing by the witnesses in the same room did not necessarily imply it to bo in the testator’s presence; for it might be in a corner of the room in a clandestine, fraudulent way7 which would not be in the party’s presence. Yet in that case it was held, that the attestation by the witness in the same room, by the request of the party, could not be fraudulent and Was sufficient. Those cases seem to be full authoritiés for holding, that this attestation, being done openly and without any clandestine appearance about it, but in the samé room with the testatrix and within two or three feet of her, when she had her senses and nothing intervened between her and the witnesses, is good under the statute; It was doné both literally and substantially in her presence : which is the safeguard provided by the law, áiíd must be enough, though it may not exclude all possible chance of imposition.
 

 The Court is not prepared to adopt the proposition, re-' specting the supposed fraud of the brother in procuring
 
 *638
 
 this will and then destroying his own. No case is found like it. There was no misrepresentation of any matter of fact then passed or supposed to be existing. If it be supposed there was an agreement lor mutual wills, it is not seen how the validity of the sister’s will could be impeached upon the bad faith of the brother in cancelling his. If the agreement was in a form to render it valid, its performance could be enforced specifically by the sister had she survived. But she died first, and the destruction of the brother's will became immaterial, because it could not have operated, if it had not been destroyed. If there was no valid contract between them, then each knew that the intended bounty by will depended upon the pleasure of the other in revoking or not revoking his or her will. So that, looking at it in any light, it is not seen, how the supposed conduct of the brother could have rendered the sister’s will a nullity, supposing it to be in other respects valid ; as the preservation of her will would only argue, that she meant to carry out her engagement in good faith at all events, or that she had not changed her mind as to the object of her bounty. But there may, possibly, be more in it than strikes one at the first blush, and, as its decision is not necessary to the determination of this case, the Court declines the decision of it. For, supposing the. law to be as laid down to the jury, there was not evidence, as we conceive, to the facts necessary to raise the point. It was but a remote inference from the evidence, that the sister, then aged and supposed to be
 
 in extremis,
 
 was induced to make her will in consideration of one in her favor by the brother. But admit that she may have been, there is no evidence that the brother contemplated, at the time, the destruction of his, nor that he did destroy it in her life time. His omission to produce it on the trial, fourteen years after her death, (which rendered it nugatory by the lapsing of the gifts) can authorise ho inference against him. Of course, no reliance is placed
 
 *639
 
 on the testimony of the witness, who speaks of seeing a will in Nathaniel’s possession a }mar or more after Martha’s death ; because, as stated, he does not speak of it as purporting to be the will of the brother or of the sister» nor whether he knew tbe handwriting to the signatures, nor whether the paper was a copy or original. Indeed, that is evidence on the other side ; whereas this question depends upon the defect of proof, by the caveators, of the fraud, which they allege and must establish. They offered no evidence to it but that of Fuller, and that is entirely deficient. He was under an impression, though not certain, that when Nathaniel executed his will he asked him to keep it — whether in the presence or with the knowledge of the sister, he does not intimate ; and he said, that, as he was leaving the house, Nathaniel got the will from him, and he never saw it afterwards, though he had examined the valuable papers in Nathaniel’s pocket book. It is singular, if any such understanding existed as to mutual wills to be kept by the witness, as is supposed, that such an immediate violation of it should not have made a permanent impression on the witness, and, indeed, that he had not communicated it to the sister. But, overlooking that, the observation is obvious, that the witness does not state that Nathaniel kept all his valuable papers in his pocket book, or that he professed to submit all of them to his examination, or, especially, that such examintion occurred during Martha’s life, which is the essential point. There is, in truth, nothing relevant to this matter, but a vague impression on the mind of the witness, that Nathaniel asked him to keep his will, and subsequently, on the same day, he took it into his own keeping; which affords no, clue to an existing intention to destroy it, or to its actual destruction then, or at any time in his sister’s lifetime. The case was, therefore, left to the jury to draw an inference of fraud against the party without any
 
 *640
 
 evidence, that could in law or reason sustain the imputation.
 

 Per Curiam. Judgment reversed and a
 
 venire de nova