In re will of WILLIAM BOWLING, deceased; NANNIE L. UMSTEAD et al., caveators, and E. H. BOWLING
et al., propounders.

(Filed 21 April, 1909.)

1. **Wills—Witnesses—Signed in Testator's Presence—Transaction With Deceased—Independent Facts.**

   Upon the trial of a *caveat* to a will, evidence pertinent to the inquiry is competent which tends to show the relative positions of the deceased and the witnesses to the will at the time of their signing in attestation, etc., that the testator rode with the witness to town to have the will attested, etc., as such, are independent matters and do not involve transactions or communications with the deceased prohibited by the statute.

2. **Same—Evidence.**

   Evidence tending to show that the testator produced the paper writing purporting to be his last will and testament, and had it signed, at a desk near by and in his plain view, by the subscribing witnesses, is sufficient to be submitted to the jury upon the question of whether the will was signed by the witness in his

presence; and it is not necessary to prove that the testator actually saw the witnesses sign, if he was in position to do so without moving from where he was, the object of the law being to prevent the fraudulent substitution of another. writing for that containing the will.

3. Wills—Fraud—Evidence—Questions for Court.

When it is shown that testator had children living by a first and second marriage, had made provision for those of the first marriage by deed a few days before making the paper writing purporting to be the will, and therein stated he had given them all he had intended; that he was eighty-four years old at the time, and died about four years thereafter, and there is nothing further to show undue influence, there is no evidence sufficient to be submitted to the jury on that question.

Action tried before *Long, J.,* and a jury, at January Term, 1909, of Durham.

The propounders offered a paper writing purporting to be the last will and testament of William Bowling, deceased, for probate before the Clerk of the Superior Court of Durham County. The caveators filed a *caveat* in due form, and filed the bond as prescribed by the statute, whereupon an issue was prepared and transferred to the Superior Court for trial. The jury answered the issue in the affirmative, and judgment was rendered in accordance therewith. The caveators noted exceptions to his Honor's rulings upon the admission of testimony and instructions to the jury, and appealed. The exceptions are set forth in the opinion.

*Manning & Foushee, J. F. Cothran* and *D. W. Sorrell* for plaintiffs.

*Aycock & Winston* and *Bryant & Brogden* for propounders.

Connor, J. The caveators lodged a large number of exceptions, but in their brief discuss only those which go to the merits of the controversy. The evidence tended to show that the testator signed the paper writing at his home and took it with him to Rougemont, a village near by, where he requested Mr. Flintom and Mr. Lawson to witness it. B. P. Bowling, son of the testator, one of the executors and devisees, testified: "I saw the paper writing, now shown me, purporting to be the will of Captain Bowling. My father signed it before he carried it down to

the store that morning. He signed it that day, before he left
home. It was in the evening, right after dinner. I went with
my father to Rougemont. We traveled in a buggy." Counsel
proposed to ask the witness, "State what your father said and
did, when he reached Rougemont, when he saw 'Squire Flintom
and Mr. Lawson." Caveators objected; overruled; exception:
"Where was this paper, now shown you, purporting to be his
will, at that time, if you know?" Objection. "The court al-
lowed witness to state, if he knew, the locality of the paper—
where he saw it—but does not allow him to make any statement
as to any transaction or communication between himself and
his father." Exception. The witness proceeded to say that he
carried his father in his buggy to Rougemont; that his father
got out of the buggy, in front of the store of Carver & Lawson;
that he (witness) drove down the road, tied his horse and went
back to the store, and that his father and Flintom and Lawson
had gone into the store. He described the position of his father
and the other persons in the store, saying that, from where his
father was standing at the time Lawson and Flintom were at the
desk, his father could see them and the top of the desk and a
paper on the desk. Caveators excepted. The first five excep-
tions are directed to the admission of this testimony, and are
based upon the alleged incompetency of the witness to testify
to any transaction or communication with his father. The
record shows that his Honor carefully confined the testimony to
what he saw his father do, and excluded any evidence of decla-
rations or conversations. It will be noted that no objection
was made to the testimony of the witness that his father signed
the will before going to Rougemont. It is decided, in *Pepper
v. Broughton,* 80 N. C., 251, that the inhibition of section 1631
of the Revisal applies to the trial of an issue of *devisavit vel
non,* that persons excluded on account of interest to testify in
regard to transactions or communications with the deceased, the
validity of whose alleged will is involved, are within the statute.
The correctness of his Honor's ruling depends upon whether the
witness was permitted to testify to a communication or trans-
action with the deceased. It has been found impracticable to
give a satisfactory definition to the words used in the statute

for the purpose of establishing a precedent for cases as they arise. Many of the cases found in the reports are very near to the line which separates those which come within the language and mischief intended to be avoided. The interpretation of the words "transaction or communication," as they are used in the statute, which was introduced into our law by the Code of Civil Procedure of 1868, was first considered in *Whitesides v. Green,* 64 N. C., 307, in which *Rodman, J.,* said: "No interested party shall swear to a transaction with the deceased to charge his estate, because the deceased cannot swear in reply. * * * But there is no prohibition against the witness testifying as to any matter other than a transaction or communication with the deceased." In *Gray v. Cooper,* 65 N. C., 183, it was held that the plaintiff was competent to prove that the defendant's intestate "had and enjoyed the services of slaves," for whose kin the suit was brought, because it was "a fact which the plaintiff might know and which he says he did know otherwise than from a transaction or communication with the intestate." In *March v. Verble,* 79 N. C., 19, plaintiff was permitted to testify that he had but one animal, for the price of which the action was being tried. *Smith, C. J.,* said: "The plaintiff did not testify to any *conversation* or *transaction* with the intestate, within the meaning of the statute, but to a substantive and independent fact." In *McCall v. Wilson,* 101 N. C., 598, it is said that an interested witness may testify what he saw the deceased do, as that he "saw the deceased stand off with the money and bring back the deed." *Lane v. Rogers,* 113 N. C., 171. In *Davidson v. Bardin,* 139 N. C., 1, *Clark, C. J.,* said: "The plaintiff was competent to testify that he went to the house of the defendant's intestate, and his condition and what she saw or heard, so long as these were independent facts and did not tend to show a 'communication or personal transaction.'" *Johnson v. Rich,* 118 N. C., 268. With the light thrown upon the subject by these decisions, and "upon the reason of the thing," we conclude that the witness B. P. Bowling was competent to testify within the limitations prescribed by his Honor. The fact that the testator rode to Rougemont with the witness, and that he left him in front of the store, cannot reasonably be said to be personal

transactions or communications.  The testimony in regard to the position of the attesting witnesses and the desk and counter in the store are manifestly independent facts.  We do not express any opinion upon the competency of witness to say that his father signed the will before he left home, because there is no objection to the admission.

Caveators insist that the testimony does not show that the attesting witnesses signed their names in the presence of the testator.  The testimony upon this point tended to show that Captain Bowling, the testator, went to the home of Mr. Flintom and said to him that he wanted him to witness his will—wanted to know where Mr. Lawson was, wanted them to witness his will.  They met Mr. Lawson at the store.  He says: "Immediately after, Captain Bowling pulled out his paper and gave it to me and Mr. Lawson, and we went in the store, in a little room where Mr. Carver did his writing, and I signed the paper. The Captain was twenty or twenty-five feet from the front door of the store when he handed me the paper.  *  *  *  The desk was opposite the door.  The gap was two feet from the desk. There was a little screen, about two and a half feet square, placed on the desk; this cut the view from the desk, if you stand in the floor opposite the desk.  The screen don't cut off the view of a person who was in the gap between the counter.  When I signed my name I was in that place.  The paper was on a little writing desk, or table, which desk had the screen to it.  *  *  *  Mr. Lawson signed it at the same time; we were both together, in each other's presence.  *  *  *  I think a person standing where Captain Bowling was when he handed me the will could have seen the desk through the window that I speak of.  *  *  * The bench on which Captain Bowling was sitting was ten or twelve feet from the window opposite the desk."  Mr. Lawson testified substantially as the other attesting witness in regard to the place at which they signed and the position of testator. He also testified that Captain Bowling said to him that he had a paper which he wanted Mr. Flintom and himself to sign for him—that it was his will; that he took it from his pocket and handed it to Mr. Flintom; it was folded.  William Mangum, who was present at the time and described the location of the

parties, said: "It seems to me that Captain Bowling was in plain view of that desk from where I last saw him; could not have been more than three feet." E. W. Thacker said: "I happened to be at Rougemont when Captain Bowling, Lawson and Flintom came in and went behind the counter. I was standing back of the store, and Captain Bowling said something to me; said he came to have his will signed. I said, 'You did?' He said 'Yes,' and some one passed along and said, 'What did he say?' and I said, 'He came to have his will signed.' I was standing twelve or fifteen feet from the desk. Captain Bowling was standing at the gap. The gap is only two feet from the desk. He was standing at the gap, and could see both the desk and the paper." H. L. Carver said: "A man standing in the gap could easily see the desk." The testator was eighty-four years of age when he signed the will. The caveators introduced no evidence. They submitted a large number of prayers, involving different phases of the testimony in regard to the position of the testator at the time, to the witnesses attaching their name to the will and his ability to see them do so. Several were given as asked, and to the refusal to give others and the giving of general instructions they assigned error. It is neither necessary nor practicable to set out all of the prayers or discuss all of the assignments of error. We have carefully examined them, and think that they are embraced in the instructions given, in so far as they were correct propositions of law. While the subscribing witnesses do not testify directly that the testator was in a position from which he could see them at the time they signed the will, and it may be conceded that their testimony leaves the question in doubt, the other witnesses, who were present and in a position to observe the transaction, testified very clearly as to this point. The other witnesses do not contradict the testimony of the attesting witnesses, but make the matter very much clearer.

His Honor instructed the jury that it was not essential to the valid execution of the will that the testator signed in the presence of the witnesses. This is sustained by authority. It is sufficient if he acknowledge his signature and declare the paper to be his will, and that they sign as attesting witnesses at his

request and in his presence. Whether this requirement is met is usually for the jury, under the direction of the court. We think that there was evidence proper for the consideration of the jury. The only question presented upon the exception is whether his Honor correctly instructed them upon the law. He instructed the jury: "If you find from the evidence, and by the weight of the evidence, that P. A. Flintom and J. J. Lawson signed their names as witnesses to the paper offered in evidence at the time they say they signed or subscribed their names as witnesses to the paper writing, that William Bowling was in a position where he did or could have seen them sign or subscribe their names, this would be a signing in the presence of William Bowling in compliance with the law, if you find the facts to be as herein recited. In order to make a valid will it was not necessary that Mr. Bowling sign in the presence of the subscribing witnesses at the time they subscribed their names to it, provided he had signed the same when he handed it to them to witness the paper. If you find that the two witnesses signed their names to the script that has been offered in evidence, and that the same was already signed by William Bowling before these parties signed their names to the paper; and if you find from the evidence that at the time the two witnesses signed the paper William Bowling was standing between the gap in the counter and within three or four feet of the desk upon which the witnesses were signing the paper; and if you find from the evidence, further, that Mr. Bowling had his face in the direction of where the witnesses were signing the paper and actually saw them, and also the paper writing that they were signing; and if you find that he was standing close enough to them to see them and the paper writing, if he desired to do so, and there was nothing obstructing the view between him and the witnesses as they were signing the paper and the paper they were signing; and if you find that, at the time when they were thus engaged in signing the said paper writing, he was in a position to see the paper writing and see them and see what it was they were subscribing their names to; and if you find that they, under these circumstances, did sign their names to the

paper, this would be a signing of the paper, agreeable to the requirements of the statute; and, nothing else appearing, you would answer this issue in favor of the propounders—that is to say, you would answer it 'Yes.' At the time they signed this paper, if you find they did sign it, if you find that he was·in a position where he could not see them nor see the paper, nor see them sign the paper, and you find.that under these circumstances they did sign this script—that is to·say, at a time when he was not in a position where he could see them nor the paper writing, nor see them sign it—this would not be a signing of the paper in his presence, as required by the statute, and you would answer it 'No.' If you find from an examination of the evidence that Mr. Bowling was standing on the porch, not far away from where the witnesses Flintom and Lawson were, and that he was in a position that he could see the witnesses and the paper writing in controversy, and could see·them sign their names to the paper writing; and if you further find that he was only a few feet away at the time, and you further find that he had himself, prior to that time, signed the paper writing, these facts, if you find them to be so, would be a compliance with the statute, and, nothing else appearing, you would answer the issue 'Yes.' But if you find that he had signed the paper, and the witnesses themselves had subscribed their names to it, but, at the time that they did so, that he was on the porch and at a place where he could not see them nor the paper they were signing, this would not be a compliance with the statute; and if you find the facts so to be, your answer to it would be 'No.' If you find from the evidence that William Bowling was in the store at the time the paper writing was witnessed by Mr. Flintom and Lawson, and that he was in such a position that he could see the instrument as it was placed upon the desk and at the time they subscribed it as witnesses; and if you find that they did so, and further find he was in such a position at the time that he might see them sign their names to the instrument and see the instrument and see them sign it; and you further find he had previously signed the instrument himself, these facts, if you find them so to be, nothing else appearing, would be a compliance with the statute, and you would answer the issue.'Yes.' You·may consider also

IN RE BOWLING.

whether this was openly done—whether the room where the alleged signature was made was light at the time—and whether the said witness returned the said paper to Mr. Bowling. The jury will also consider the evidence that relates to the size of the room, to the distance of Mr. Bowling from the subscribing witnesses, the position of the window and that of the counter, and especially of the desk; the localities of the parties, both the witnesses and Mr. Bowling, and all of the other facts and circumstances that have been given in evidence by the defendant's witnesses. If, after reviewing all the evidence, your minds reach the conclusion, from the evidence and by the greater weight of it, that the paper writing was executed by the said William Bowling, witnessed by Flintom and Lawson in his presence, you would answer the issue 'Yes.' The deceased, William Bowling, must have actually seen, or have been in a position to see, not only the witnesses, but the paper writing itself, at the time the witnesses signed the same; and if the jury shall believe from the evidence that he did not see the paper writing and the witnesses at the time that the witnesses signed it, they should answer the issue 'No.' "

We think these instructions are fully sustained by the authorities. In *Bynum v. Bynum*, 33 N. C., 632, *Ruffin, C. J.*, said: "Actual view is never necessary, but it is sufficient if the party might see the witnesses attest, though in a different as well as in the same room; for, if actual sight were requisite, if a man did but turn his back, or look off, though literally present by being at the spot when the thing was done, the attestation would be invalid." In *Cornelius v. Cornelius*, 52 N. C., 593, *Judge Manly* said: "The strictest interpretation of the law has gone no further than to require that the testator should be in a position and have power, without a removal of his person, to see what was done. It is not necessary for him, in fact, to see." *Burney v. Allen*, 125 N. C., 314. The examination of the testimony in these cases will show that they are direct authorities to sustain his Honor's instructions. If the testator is able to see the attestation by the witnesses, it is not material to prove that in fact he did not see it. But he must be able to see the witnesses subscribe the will or, to define the rule more clearly, their

relative position· to him at the time they are subscribing their names as witnesses, whether they are in the same room with him or not—must be such that he may see them if he thinks proper to do so; *   *   * for the purpose of the law is not so much to secure a signing of the names of the witnesses in the actual view of the testator as to afford him an opportunity to detect and to prevent the substitution of another will in the place of that which.he has signed." 1 Underhill Wills, sec. 196. The instructions are very full and present every phase of the testimony.

His Honor instructed the jury that there was no evidence of fraud or undue influence. The testimony showed that the testator had been married twice and had living children by both ·wives; that two days before making his will he executed deeds for several tracts of land, aggregating 2,400 acres, to his children by his second marriage. It will be observed that in the fourth item of the will he says: "To the children of my first marriage I have heretofore given as much property as I intended for them, and therefore I make no further provision for them." He directs payment of a bond of $849, which he had given to the· clerk, to his children by his first marriage. He had given them some lands of small value. He was eighty-four years of age when the will was executed, in 1903, and died in 1907. There is no suggestion of any other circumstances relied upon to show undue influence. We concur with his Honor that there was no evidence fit for the consideration of the jury tending to sustain the allegation. We have examined the entire record and the briefs of counsel, and find no error. The case was carefully tried and fairly submitted to the jury. We note a want of uniformity in the manner of stating cases involving the trial of an issue of *devisavit vel non.* It would seem that, in view of the fact that there are no parties, in the usual sense of the term, the case should be stated *"In re* will of," etc.

There is

No Error.