C. W. YOUNG v. CHAMPION FIBER COMPANY AND WILLIAM BATTERSON.

(Filed 29 May, 1912.)

1. Nonsuit—Evidence, How Considered.

Upon a motion for nonsuit, under the statute, or for defendant's prayer that on the entire evidence, if believed, the verdict should be for the defendant, the evidence should be construed in the light most favorable for the plaintiff, according to the doctrine announced in *Deppe v. R. R.*, 152 N. C., 79.

2. Master and Servant—Safe Appliances—Safe Place to Work—Negligence—Evidence—Nonsuit.

In an action for damages for a personal injury received by the plaintiff while at work in the defendant's pipe foundry, there was evidence tending to show that while plaintiff was endeavoring to fix, at night, under protest to his superior, a badly worn and out of repair machine, for the purpose of cutting a heavy piece of pipe, he gave one of the dies a slight tap with a hammer which had been furnished him for the work, which was an improper one, and caused a small particle of steel to break and fly off from the die or hammer and strike the plaintiff in the eye, inflicting the injury complained of; that there was an insufficiency of light, by reason of two of the three incandescent electric lights at the place being negligently out of fix, leaving only one, which the plaintiff had to hold, causing his eye to be nearer his work, in a position not required had the light been sufficient, and that the injury would not otherwise have been inflicted: *Held*, a permissible inference that the proximate cause of the injury

was the failure of the defendant to furnish a proper hammer and to provide adequate lights; that it was sufficient upon the question of actionable negligence, and defendant's motion to nonsuit was properly disallowed.

### 3. Same—"Ordinary Tools."

It being established that the master furnished the servant a hard-tempered steel hammer with which to fix an old, badly worn machine to be used in cutting a heavy iron pipe in his foundry; that the hammer furnished was known to be dangerous for that class of work, a soft-metal hammer being safer for the purpose: *Held*, the master is responsible in damages for an injury proximately caused to the servant by the use of the improper hammer furnished him, and the doctrine of the use by the servant of "ordinary everyday tools and under ordinary everyday conditions," does not apply. *House v. R. R.*, 152 N. C., 397, cited and distinguished.

Appeal from *Long, J.*, at March Term, 1912, of Buncombe.

Civil action to recover damages for loss of eye caused by alleged negligence of defendant company and of William Batterson, superintendent, having general supervision of the pipe department of defendant company and the laborers employed therein. Defendant denied the alleged negligence and pleaded contributory negligence and assumption of risk on part of plaintiff.

On issues submitted as to negligence, contributory negligence, assumption of risk and damages, there was verdict for plaintiff. Judgment on verdict, and defendant excepted and appealed.

The facts are sufficiently stated in the opinion of the Court by *Mr. Justice Hoke.*

*Craig, Martin & Thomason for plaintiff.*
*Bourne, Parker & Morrison and Martin, Rollins & Wright for defendant.*

Hoke, J. It was chiefly contended for defendant that the motion for nonsuit, under the statute, should have been allowed or the prayer given, that, on the entire evidence, if believed, the verdict should be for defendant, and more especially on the first and second issues. It has been repeatedly held with us that, in either case, "The evidence must be construed in the view most favorable to plaintiff, and every fact which it tends to

prove, and which is an essential ingredient of the cause of action, must be recognized as established." *Deppe v. R. R.,* 152 N. C., 79; *Edge v. R. R.,* 153 N. C., 212, and, on the facts in evidence, when so considered, the position cannot for a moment be maintained. There was allegation, with evidence on part of plaintiff tending to show, that he was an employee of defendant company, working in the pipe department, and on the night of 13 November, 1910, or in the early morning about 2 A. M., while plaintiff, in obedience to orders of one of his superiors, was engaged in adjusting a machine with a view of cutting a heavy piece of pipe, he gave one of the dies a slight tap with his hammer, causing a small piece or particle to break and fly off from the die or hammer, striking plaintiff in the eye and resulting in the loss of his sight. That the machine furnished him by defendant company and with which he was working at the time was badly worn and out of repair, and, as it did not work properly, defendant attempted to fix and adjust it; that he had no tools with which to do this except a hammer of hardened steel, and it was the duty of defendant to have furnished him some soft-metal hammer to settle the dies, these being also of highly tempered steel; that the defendant had provided no sufficient light and no one to help plaintiff while he was attempting to operate and fix the heavy machine and to cut and fix the pipe, and while attempting to fix it, it was necessary, on account of the insufficient light and help, for him to have his face in close proximity to the machine, and as he struck with the hammer in his attempt to adjust it a small piece of steel flew off and struck plaintiff's eye, causing the loss of the sight as stated.

A very correct synopsis and partial excerpt from the testimony, tending to support a right of recovery by plaintiff, appears in the brief of counsel as follows: "Plaintiff replied, 'What about this pipe? Can't we leave it here until morning? There will be two men here who can cut it.'" Sears (plaintiff's superior) said: "He had to have it the first thing in the morning and could not wait" (12). Plaintiff testified that he "needed help to use that machine on that pipe," and continuing, said:

A. I was looking at the dies, and I seen that one of the dies was a little bit higher than the other, and I took my hammer in my hand, to see if I could knock it down, and I had the light in one hand, pulling it up. There was just one light over this machine that was burning. There were three lights, but something was the matter with the others; and I had my head close to it, and I tapped it one little tap with the hammer, and a piece flew into my eye (12).

Q. What sort of a hammer was it? A. It was a steel hammer, I suppose.

Q. How many lights over that machine? A. There were three lights over it, but only one of the lights would burn, and it was about 8 feet from the machine.

Q. What kind of a light was burning about 8 feet from this machine? A. Just a small light.

Q. What candle-power, if you know? A. Not over 16.

Q. Why did you have to hold your eyes so close to that machine? A. *Because there was not much light around the machine,* and I had to put it close up to see it (13).

Q. You say there was one light over this machine—how many lights were over this machine that you got hurt on? A. Three.

Q. How many were burning? A. One.

Q. Why were the others not burning? A. They were out of fix.

Q. What did you have to hold in your hand? A. I had to hold the light.

Q. And what in the other hand? A. I had to do the work with the other hand.

Q. If there had been more lights there, so that it would not have been necessary for you to hold the light over it, how could you have done the work? A. I could have taken both hands, and I then could have done my work without getting hurt.

Q. What was the condition of this machine? A. It was *old and worn and hard to set.* One could not hardly set it himself. I always had somebody to help me. I knew very little about how to do the work.

Q. How many times had you tried to work it by yourself? A. That was the first time I tried it, that night.

Q. If there had been more lights there, how would it have been necessary for you to have held your face, with reference to the machine? A. No, sir; I could have stood back further from it.

Q. Do you know what kind of a hammer ought to have been provided at that machine? A. There ought to have been *some soft-metal hammer to settle the dies.*

Q. Did you ever see any one else settle the dies there? A. Yes.

Q. What did they use? A. A steel hammer.

Q. Hammer like this one you used? A. Yes; just like it.

Q. What other instrument was provided for you to settle these dies, except the steel hammer? A. None. Mr. Batterson gave me charge of the tools ——

Q. How did that machine work—did it work well or badly, or how? A. It worked badly (14).

Q. Why? A. Because it was worn out and stayed broken about half the time, and you could hardly cut a pipe with it. Half of the threads stayed out of fix all the time that I was there.

Q. State the condition of the light there, with reference to its illuminating effect? A. It was very dimly lighted.

Q. You say a piece of steel flew from what? A. It was a piece of steel or a piece of iron. I reached over to the back part of the die to see if I could loosen it—to see what was the matter—and when I tapped the die a piece flew in my eye (15).

The plaintiff said that he did not know that the die was made of tempered steel (18), nor did he know that it was dangerous to use the hammer (23), as that was the customary way of settling the dies (22, 23, 24, 64), by men of more experience than he had (64). He said that the lights had been out of fix a month (28); that he had tried to fix them that night and couldn't (28, 36); that the hammer belonged to the Champion Fiber Company (29); that he had complained of the lights and had asked the electrician to fix them (35). Batterson testified that the electrician was the proper person to whom he should report the defective condition of these lights (55).

The defendant Batterson testified, among other things, in substance as follows:

It is not safe to hit two highly tempered pieces of steel together; this is a matter of common knowledge among mechanics; this die was made of tempered steel (41). It was dangerous to hit this die with this hammer (42, 50).

Q. And you had hammers to fix those dies with? A. Yes (50).

Q. And you know—have learned—that it would have been a very improper thing to have done to put a man there to knock one of those dies with a hammer? A. Yes.

Q. That would have been very negligent in the company to have done that? A. Yes (51).

Batterson testified further that it was his duty to see that the lights were in proper condition; that all the lights ought to have been burning, and that he did not know whether they were in proper condition or not (52).

Brown, a witness for the defendant, testified that it was dangerous to hit two pieces of steel together, but could not say that this was common knowledge (55); that he had been engaged in the business twenty years (55).

A perusal of this testimony affords a fair and reasonable inference that there has been a breach of duty on the part of the defendants, the proximate cause of plaintiff's injury, in failing to supply sufficient light and in furnishing an improper tool for the work in which plaintiff was then engaged.

It was earnestly urged for defendants that the facts present a case of excusable accident within the principle of *House v. R. R.,* 152 N. C., 397, and other cases of like kind excusing the employer under given circumstances when the injury "occurred in the use of ordinary everyday tools and under ordinary everyday conditions requiring no especial care, preparation, or prevision, where the defects are readily observable and there was no good reason to suppose that the injury complained of would result"; and *Martin v. Manufacturing Co.,* 128 N. C., 264, is relied on as decisive in favor of defendant's position, that being a case where "an employee was hurt in the eye by a particle of flying steel knocked off by the blow of a hammer";

but to allow this position on the facts presented here would be to ignore much of the significance of the evidence. The plaintiff, while saying that he was not aware of the extent of the danger or that he would likely be hurt by giving the light blow with the hammer, as he did, testified directly that he should have been supplied with "some soft-mettle hammer to settle these dies."

And the defendant Batterson, himself, testified and offered other evidence tending to show that both the die and the hammer being of highly tempered steel, it was very dangerous to use the hammer for the purpose of settling the dies, and endeavored to impress upon the jury the view that the danger, in such case, was so obvious and of such common knowledge that plaintiff was guilty of contributory negligence in using the hammer for the purpose. This, then, was no instance of injury received in the ordinary use of a hammer, a proper tool for the purpose, and by reason of a defect therein, hidden or unobservable, as in *Martin's case,* but the facts present the case of supplying the employee with an improper tool for the work he was called on to do and one that was not unlikely to produce the result which followed, bringing the case clearly within the principle of *Mercer's case,* 154 N. C., 399; *Avery's case,* 146 N. C., 592.

It was further insisted that the absence of sufficient light should not have been allowed to affect the result, because there was no satisfactory evidence showing that such condition in any way contributed to the injury, the position being that as a light was only required to look into the slot when clearing it out in preparation for the die, plaintiff could only use for the purpose the one drop light, it being necessary in any event to hold it up close so as to see the aperture; but here, too, the argument is in disregard of the testimony making for plaintiff's right to recover.

On this question the plaintiff, testifying in his own behalf, among other things, said: "That the machine worked badly; that it was worn out and stayed broken about half the time, and you could hardly cut a pipe with it; that it was hard to set, and one man could hardly set it himself at all, and he always

had had somebody to help him; that he himself knew little how to do the work. That the light was very dim, so much so that he had lodged a complaint about it, and for this reason he was compelled to hold the drop light in one hand and do the work with the other, and was compelled also to hold his eyes close to the machine, and but for this he could have taken both hands to the work and stood farther back and *done the work without getting hurt."*

Under a comprehensive and learned charge, in which the principle of actionable negligence, contributory negligence and assumption of risk have been correctly stated and applied according to approved precedents obtaining with us, the jury have accepted plaintiff's version of the occurrence, and this being true, we are of opinion that an actionable wrong has been clearly established against defendants. *Avery v. Lumber Co., supra; Mercer's case, supra; Pritchett v. R. R.,* 157 N. C., 88-102; *Walker v. Manufacturing Co.,* 157 N. C., 131; *Bushing v. R. R.,* 149 N. C., 158; *Orr v. Telephone Co.,* 132 N. C., 691; *Lloyd v. Hanes,* 126 N. C., 359.

The objections to the ruling of the court on questions of evidence are without merit. On careful examination of the record, we find no reversible error to defendant's prejudice, and the judgment in plaintiff's favor must therefore be affirmed.

No error.