This is a proceeding begun before the clerk of the Superior Court of Buncombe County to probate a paper-writing purporting to be the last will and testament of Margaret Deyton, deceased, in solemn form. A caveat having been filed, the issue devisavit vel non was raised and the cause was transferred to the civil issue docket for trial upon that issue. At the February Term, 1919, it was heard by the court and a jury. At the close of the evidence the trial judge directed a verdict as appears hereafter in the record. The usual issue was submitted to the jury and answered in the negative, viz:
1. Are the paper-writings, or any part thereof, and if so, (496) what part, the last will and testament of Margaret Deyton, deceased? Answer: "No."
The following is a statement of the material evidence introduced at the trial:
R. C. Pickens, a witness for the propounders, testified: "My name is R. C. Pickens, called Chris Pickens. Margaret Deyton called me `Uncle Cris.' I was her uncle, and was her guardian, after the death of her father. She lived with me for ten or fifteen years. She died at my home, March, 1917. She was a little more than Twenty-one years of age when she died. She had been in New Mexico for her health before she died. She was afflicted with tuberculosis, and had been sick a year or two before she went to New Mexico. She had to quit school before she graduated on account of her illness. She stayed at my home and attended school at Weaverville College. After her return from New Mexico she stayed at my house, and I saw her every day a great many times during the day, and up to the time of her death her mental condition seemed to me to be perfectly good, as good as ever I knew. I *Page 523 
talked to her at different times. A good many people visited her during her last illness, among them Mrs. Guy Edwards, Mrs. Georgia Burgin, Dr. Gill and others. Mrs. Gale was her nurse. Margaret Deyton called my daughter, Mrs. Bates, `Myrtle.' She called my wife `Aunt Mollie.' My son-in-law, Mr. Bates, `Burt.' She called her sister `Mollie.' That was her only sister. She did not have any brothers living. Her father and mother were both dead, and she had one brothers and one sister who died before her death. Margaret was about one year old when her mother died. She was younger than her sister Mollie. Her mother was half-sister to my wife. Margaret owned one-half interest in a place at Black Mountain that was estimated to be worth $5,000. Her sister owned the other half. She also had property in Yancey County. I have been on the property a great many times. I guess it is worth four or five thousand dollars. There is a mine on the place that I, as her guardian, leased to a mining company. They mined feldspar and mica. Under the lease I gave them, they were to pay fifty dollars per month as a minimum, and for whatever above the minimum they produced they were to pay a royalty of seventeen cents per ton on. This mine belonged to these two girls, as well as the Black Mountain place. Also a little mountain piece, worth four hundred to five hundred dollars, near Black Mountain."
Mrs. Georgia Burgin, witness for the propounders, testified: "I knew Miss Margaret Deyton, and had known her from the time she was a baby. From the time when Mr. Pickens took her, when she was a year and a half old, I guess. Mr. and Mrs. Pickens took her and raised her from the time she was something like one and one-half years old. I live about one-fourth mile from them, something less than a (497) quarter of a mile. I am sure I saw her after she came back from New Mexico. Physically, she was very weak when she came back. I talked to her a number of times. I saw her several times a day when she was sick and was there three whole nights and a half in one week. I heard Margaret say that she intended to educate Mary Margaret. She was a cousin to the mother, Mrs. Myrtle Bates, Mr. Pickens' daughter. Mary Margaret was the oldest child of Mrs. Bates and the only child that she had at that time. The Margaret in the child's name was for Margaret Deyton. Margaret Deyton was away in New Mexico for a year before the death, and it was a year before that she had been afflicted with the disease. She had to leave school a year before she went away. I heard her say that she intended to educate her namesake, Mary Margaret. That was in the early part of the summer or early fall before she went to New Mexico. Margaret and her cousin, Mrs. Bates, were like sisters. It seemed to me they were almost like sisters. Miss Myrtle Pickens, now Mrs. Bates, was at home during the greater part *Page 524 
of the time when her father, Mr. Pickens, reared Margaret Deyton. They attended Weaverville College together. Miss Deyton's mental condition was good after she came back from New Mexico until she died. I did not see the will or hear her mention it. I have no interest in this action. I suppose you might say that Miss Margaret Deyton and Mrs. Bates were half first cousins."
Mrs. Mamie Garrison, witness for propounders, testified: "I am the daughter of Mr. George Pickens. Mr. R. C. Pickens is my uncle, I visited at his home often. Margaret Deyton lived with my uncle, Mr. Pickens, before she went to New Mexico for her health. I saw her often. She was a great friend of mine. When she returned from New Mexico she was weak physically, but mentally she was all right. After she came back she was tired and seemed to think she would get better, and what she talked about principally was to tell about her trip to New Mexico. I never heard her say anything about the will. I went to see her on Tuesday after she came back home and left Wednesday evening."
Mrs. C. W. Bates, witness for propounders, testified: "My given name is Myrtle, and I am the daughter of Mr. and Mrs. R. C. Pickens. I knew Margaret Deyton from her babyhood. I was about nine years older than she. I am the mother of this little girl, Mary Margaret Bates. She is my oldest child. The only child I had when the will was made. She was named Mary for her grandmother and Margaret for my cousin, Margaret Deyton. I am the wife of Rev. C. W. Bates, pastor of Grace Church at Greensboro, now. When the will was executed we lived in Asheville, where he was pastor of the Asheville Methodist Protestant Church. He was pastor of the church for five years. (498) We went from there to Grace Church at Greensboro. I remember when Miss Deyton came back from New Mexico. My husband, Mr. Bates, went out there for her and brought her back. The body of those papers (A and B) are in my handwriting. Margaret Deyton deposited the paper-writings marked Exhibit `A' and `B' with Mr. Bates, and he took them. He was gone just about a week. My husband had no other purpose in going to New Mexico except to go after her. I was with my cousin Margaret almost continually up to the time she died. She died at my mother's home. Her mental condition was excellent, even to small details."
C. H. Shope, witness for propounders, testified: "I live at Weaverville, about a couple of hundred yards from Mr. R. C. Pickens' residence. I knew Miss Margaret Deyton for about ten years. She lived with Mr. Pickens. I went to see her several times after she came back from New Mexico. I do not think she lived over a week after she came back; maybe eight days. So far as I had any conversation with her, I *Page 525 
never detected anything wrong with her mind. She was always considered a bright girl in Weaverville. I did not talk very much with her. I would go up almost every day and see her and ask her if I could do anything for her. She would always answer me intelligently. I did not allow her to talk to me much, because she was weak and it would make her cough. I am not related to any of the parties and have no interest whatever in the suit."
Mrs. Loula Gill, witness for the propounders, testified: "I am the daughter of Mr. Wesley Gill, of Weaverville, and have known Miss Margaret Deyton for about fifteen years. I lived about a mile from her. I went to see her after she came back from New Mexico. I knew her well before she became sick. When I went to see her she talked very sensibly; was in her perfectly right mind."
Mrs. Georgia Burgin, witness for propounders, was recalled and testified: "Deceased asked me to fill out some checks after she came back to pay certain bills she owed in New Mexico, and one for Mr. Bates in the sum of fifty dollars. I think she had a clear conception and understanding of her business affairs. I think the check for Mr. Bates was drawn by some one. I know he got the watch she intended for him."
Mrs. Priscilla Gale (wife of T. K. Gale), witness for the propounders, testified: "My name is Priscilla Gale, and my home is in Asheville. I am a widow, my husband being dead. My occupation is nurse. I am now engaged to nurse a patient at Tryon, N.C. and have just come from Tryon. I knew Miss Margaret Deyton; I nursed her during her last illness. She lived a week after I took charge of the case. I was with her all the time during that time. She was sane. I remember her executing a paper-writing that she called her will. I signed each of the two as a witness. I saw Miss Margaret Deyton sign them. (499) Mr. and Mrs. Bates, Mrs. Pickens, and Miss Annie Stepp and I were present at the time. I saw Miss Annie Stepp sign the paper-writing. I certainly was present when she dictated this paper. She said that she wanted to make her will and she asked me to get some paper so she could make her will, because, she said, she thought every one ought to make a will, and then she went ahead and made her will just like it is there."
By the court: "Who wrote it?" A. "Mrs. Bates. She asked Mrs. Bates to write it. I do not know that I remember just everything she said, but she went ahead and told what she wanted each one to have — what she wanted Mr. Pickens to have and Mrs. Pickens and Mary Margaret and Mrs. Bates; stated what she wanted each one to have. After it was written, as Miss Margaret dictated it, they read it over to her and asked her if that was all right, and she was satisfied. That was after she had dictated it and before she signed it. Mrs. Bates read it *Page 526 
over to her, and she said it was all right, and she signed it. I signed it at her request. What appears on that card, Exhibit `A,' was signed one day and the other was signed the next day. I think she had thought of things that perhaps she had left out of the other and wanted to be sure that it was like she wanted it before she left. When Exhibit `B,' the last one, was signed she just said she wanted her uncle to have that suit of clothes and the pastor the money. She said, `I have left them out and I want to give that twenty-five dollars to the church.' She said, `I have not given anything to the church this year and I want to give this,' and that was put on that. I believe Miss Annie Stepp came in to witness it. I am sure she did. I heard Miss Deyton ask Mrs. Bates to go for her to witness the will. She asked Mrs. Bates to go and get Miss Annie Stepp, and Mrs. Bates went for her. I saw her sign that. I did not notice whether Miss Annie read it. I do not believe I remember whether she read it over. Of course, I was busy. Miss Margaret lived about one week after she came back from New Mexico, and I was her nurse at the time. She was very weak when she came, but still until the last she was not so very weak. I would take her up in bed to bathe her and comb her hair, and she would sit up and make out checks. She died of tuberculosis. Of course, she gradually got weaker. She died about two or three days after she signed those cards. Mrs. Bates, Mr. Bates, Mrs. Pickens and myself were in the room when she wrote Exhibit `A.' Miss Margaret read it over after the card was written. Mrs. Bates read it to me. Miss Margaret dictated it and read it herself. She had it in her hand. I saw her look at it as she was reading it. She signed her name. She did not have any help in signing it. She held the pencil herself, or pen. Mr. Bates, Mrs. Bates and Mrs. Pickens and myself were present when she signed it. No one else was in the room (500) when she signed it. After she looked it over and signed it, then Mrs. Bates read it over to me, and of course I signed it. She did not sit up when she signed it; she was lying down. I was right in the room where she was, standing right by the side of her bed. When I signed it Miss Margaret was looking at me. No one else in the room at the time."
Q. Who suggested to have another witness? A. "I don't remember who suggested that."
Q. But anyhow some one suggested it? A. "Some one suggested it, yes."
Q. Mrs. Bates wanted to have the witness? A. "Yes."
Q. How long was she gone when she went to get Miss Stepp? A. "Oh, not a minute scarcely."
"Came back with Miss Stepp and Mrs. Suttles. After Miss Stepp *Page 527 
came in she was told about the will. I believe Mrs. Bates was talking to her and said that Margaret wanted her as a witness to sign that. She told her that Margaret and I had already signed it. Miss Stepp took the card and pencil, or pen, whatever it was she signed it with. She was standing at the foot of the bed. She was facing her and Miss Margaret was lying flat on her back. She was looking at her. I saw Miss Stepp sign, and Miss Margaret certainly was in a position to see her sign it. Miss Stepp did not see me sign it. This second card, Exhibit `B,' Mrs. Bates wrote that. It was written in my presence and Miss Margaret signed it in my presence, and Mrs. Bates and myself, and I am not sure that Mrs. Pickens was in there or not. I do not remember. Miss Stepp was in the room. This second paper was not signed by Miss Stepp in another room entirely. Both of them were signed in Miss Margaret's presence. Miss Stepp came in after I had signed it. In both cases she was not in the room when I signed it or when Miss Margaret signed it. Mrs. Bates told Miss Annie Stepp when she came in the room that Miss Margaret wanted her to sign the will as a witness. That was within the hearing of Miss Margaret Deyton and was in the room with her. The first paper was signed the first afternoon it was made. When she remembered those things that she wanted added on to the first one that he had not put down. She had not told them those things. Those things she wanted added to it. Those are the same paper-writings and all parts of them that I signed."
Mrs. Bates, recalled: "Miss Annie Stepp was in the house at the time the will was executed. I went for her to witness it. I said to her (Miss Stepp), in the presence of Miss Margaret Deyton, `Here is her will and she wants you to sign it.' Miss Annie signed it. She was at the table at the foot of the bed. It is a small room and there was a small table at the foot of the bed, and she signed it there in view of Miss Margaret. Margaret was lying on her back, facing the foot. Miss Stepp was standing at her table at the foot of the bed. Mrs. (501) Gale was in the room. Miss Annie Stepp signed the paper-writing as a witness immediately after I made that statement. That was the first paper-writing, Exhibit `A.' The paper-writing, Exhibit `B,' contains two items; they are in my handwriting, the main body. I do not recall whether Exhibit `B' was signed by Miss Stepp in a different room. I know it was made in the night after the first one was made, and Miss Annie was asleep and through Margaret's thoughtfulness she was not to be wakened before morning. I really could not tell, Mr. Brown, whether it was signed in a different room."
Mrs. Annie Stepp-Suttles, a witness for the propounders, testified: "I live at Black Mountain. My name was Annie Stepp before I married Mr. Zeb Suttles. I am a cousin of Miss Margaret Deyton. I was at *Page 528 
Mrs. Pickens' when Miss Margaret Deyton executed the paper-writing. I signed the paper identified as Exhibit `A' as a witness. There is my signature. When I signed it I do not remember whether it had already been signed by Mrs. Gale. I also signed the paper identified as Exhibit `B.' I signed the first paper, Exhibit `A,' in the room where Margaret was. I signed the second paper, Exhibit `B,' just across the hall from Margaret's room, in Mrs. Pickens' room. I do not remember whether the doors were open. I do not know that. I signed Exhibit `A' in the room where Margaret was present and in where Margaret was sick. There were several in there at the time I signed it, but I do not remember just who they were. I did not see Miss Margaret sign her name to Exhibit `A.' I did not see Mrs. Gale sign her name to Exhibit `A.' Miss Margaret did not tell me that she had signed her name, or that she had made her will; she did not mention it. The only person that said anything to me about the paper-writing was Mrs. Bates. She told me to sign it; told me that she wanted me to sign it. Miss Margaret was lying on her back in bed. She could see me sign it if she had been looking. I do not know where Mrs. Gale was at the time; she could possibly have been in the room. I do not know. I was not at the house when the paper was written. When I came in Mrs. Pickens told me she was making her will. I did not go in the room, and then Mrs. Bates came and told me to come in and sign it. Mrs. Pickens is Mrs. Bates' mother. This paper, Exhibit `B,' was signed the next morning. I do not remember what names were on the paper when I signed it. I did not see anybody sign Exhibit `B.' Miss Margaret never told me she was making her will. I signed the second paper, `Exhibit B,' in a different room. Miss Margaret could not have seen me sign the last one. I do not know where Mrs. Gale was at the time I signed the last one. Miss Margaret never mentioned the will to me at all; Mrs. Bates asked me to sign it. She never requested me to sign either one of them. I did not see (502) her sign and she did not request me to sign either one of the papers. Miss Margaret was very weak when I went into the room and signed the paper."
EXHIBIT "A."
One year's royalty from the mines to be given to Aunt Mollie. Enough to get one South Bend watch for Bert. Fifty dollars for Myrtle. My watch for Mollie. Lavalleire for Iona. Buried with topaz. One thousand dollars for Mary Margaret for her education, to be used only for that. *Page 529 
My suit and whatever clothes Mollie would like, including my coat, given to her.
All that remains over and above these foregoing bequests be given to Mollie. MARGARET DEYTON.
Witnesses:
Mrs. PRISCILLA GALES. ANNIE STEPP. March 2, 1917.
EXHIBIT "B."
Twenty-five dollars to pastor's salary in M. P. Church, Asheville. Nice suit of clothes for Uncle Cris. MARGARET DEYTON.
Witnesses:
MRS. PRISCILLA GALES. ANNIE STEPP. March 2, 1917.
Caveators requested that the jury be directed to answer the issue "No," and Judge Justice charged the jury as follows:
"Gentlemen, this is a matter of law, and the court will have to charge you that under the law that this testimony, this proof, does not come up to the requirements of the law, and that, therefore, this will has not been proven in accordance with the law, and the court instructs you that it is your duty to answer this issue `No.' That is the ruling of the court. Of course, the other side can take it to the Supreme Court and have it reviewed."
Propounders duly excepted. Judgment for caveators, and propounders appealed.
As the judge gave a peremptory instruction to the jury that the issue should be (503) answered "No," the evidence must be taken as true and considered in the most favorable view for the propounders, and if there is any inference of fact which the jury may have drawn from it, and which would sustain the paper-writing, or either of them, as the will of the deceased, the charge was erroneous, and we are of the opinion that there was such evidence.
The legal effect of a directed verdict is the same as that of a nonsuit or dismissal under the statute (Hinsdale Act), the court does not *Page 530 
weigh the evidence, but assumes it to be true in favor of the defeated party. Cases directly in point are Hodges v. So. Ry. Co., 122 N.C. 992;Brown v. A. C. L. R. R. Co., 161 N.C. 573; Harton v. F. C. Telephone Co.,146 N.C. 429; Embler v. Gloucaster Lumber Co., 167 N.C. 457; Denny v.Burlington, 155 N.C. 33; and as to effect of nonsuit in this respect,Brittain v. Westall, 135 N.C. 492; Cotton v. R. R., 149 N.C. 227; Deppev. R. R., 152 N.C. 79; Young v. Champion Fibre Co., 159 N.C. 375.
Applying this familiar rule to the evidence as it appears in the record, we conclude that there was some proof from which the jury may have correctly drawn inferences favorable to the propounders, and that it should have been referred to the jury with proper instructions on the law. We have set forth only enough of the evidence to show that there was some, at least, which favored the propounders' contention, that is, only a substantial and material part of it. We are not advised by the charge as to what was the particular and fatal defect in the proof. The testator was of sound mind, unusually bright, as said by one of the witnesses, and in full possession and use of her mental faculties. There is evidence that she had signed the papers and had them signed by one of the subscribing witnesses, and asked Mrs. Bates to call in Miss Annie Stepp to subscribe as the other witness to her will. This Mrs. Bates and Miss Stepp did, in compliance with decedent's request, and it is perfectly manifest that the latter knew the paper and its contents, and there is evidence that both witnesses signed the paper, as witnesses to it, in testator's presence and with her knowledge. The testimony of Mrs. Gale shows this to be the case, and there is more besides. The circumstances and surroundings are some evidence of it, from which the jury may reasonably infer the ultimate fact of the will's execution. It is not required that subscribing witnesses should sign in the presence of each other, Watson v. Hinson, 162 N.C. 72; Collins v. Collins,125 N.C. 104; Eelbeck Devisees v. Granberry, 3 N.C. 232; Rev., sec. 3113, nor is it necessary that the will should have been attested in the same room, provided the witness signed it, where the testator could see them do so; that is, could see them sign the very paper that she had (504) signed, so as to prevent the substitution of the genuine paper for another and spurious one. It was held in Graham v. Graham,32 N.C. 219: "A will is well attested by subscribing witnesses when, though not in the same room with the testator, they are in such a situation that the testator either sees or has it in his power to see that they are subscribing, as witnesses, the same paper he had signed as his will. Where the supposed testator could only see the backs of the witnesses, but not the paper they were subscribing: Held, that the paper-writing was not well attested as a will." See, also, Cornelius v. Cornelius, 52 N.C. 593; *Page 531 Bynum v. Bynum, 33 N.C. 632. "Generally the witnesses are not required to subscribe the will at the express request of the testator. He need not formally request the witness to attest his will as the request may be implied from his acts and from the circumstances attending the execution of the will. Thus a request will be implied from the testator's asking that the witness be summoned to attest the will, or by his acquiescence in a request by another that the will be signed by the witnesses." Thompson on Wills, 449; In re Herring's Will, 152 N.C. 258;Burney v. Allen, 125 N.C. 314; In re Cherry's Will, 164 N.C. 363. Testator must have seen the witnesses, or have been able to do so at the time of the attestation in the position he then was. Jones v. Tuck,48 N.C. 202. There is another important question here which is raised by the apparently conflicting testimony of Mrs. Gale and Mrs. Annie Stepp Suttles as to where the papers were witnessed and subscribed by the latter. The law seems to be settled in this State that parties are not to be bound or concluded by the testimony of one of the subscribing witnesses, but may show the very truth of the matter by other testimony. As determined with us, the principle may be thus substantially stated and it is well supported by Bell v. Clark, 31 N.C. 239, in which the opinion was delivered by that eminent jurist, Chief Justice Ruffin. The law makes two subscribing witnesses to a will indispensable to its formal execution. But its validity does not depend solely upon the testimony of those witnesses. If their memory fail, so that they forget their attestation, or they be so wanting in integrity as wilfully to deny it, the will ought not to be lost, but its due execution and attestation should be found on other credible evidence. The leading case on this point is that of Lowe v. Joliffe, 1 Bl. 365, which was a remarkable one, and fully establishes this position. It has never, we believe, been questioned, but has been always spoken of with approbation. In Jacksonv. Christman, 4 Wend. 277, it was laid down as undoubted law that if the subscribing witnesses all swear that the will was not duly executed, yet it may be supported by other witnesses, or circumstances. In this Court, Lowe v. Joliffe has been always understood to be law.Crowell v. Kirk, 14 N.C. 355. For although the law requires all the witnesses to be called, if within the jurisdiction, it would be (505) most unreasonable to conclude the party calling them, as to the execution of a will, more than in respect to any other instrument. The obligee must call the subscribing witnesses to a bond, but as his testimony that it was executed does not conclusively prove it, so his denial of his attestation or of the execution by the obligor does not absolutely destroy it, but the parties may give other evidences that it was or was not duly executed. Holloway v. Lawrence, 8 N.C. 49; 1 Phil. Evi. 475, and the cases cited. The same reason applies to a will with *Page 532 
even more force. And again, as was said in Crowell v. Kirk, supra, the subscribing witness to a will is rather the witness of the law than of the party calling him, and therefore the party is not bound to take his testimony as true, but ought to be at liberty to contradict and discredit him. It is impossible the Legislature should mean that one of the most solemn acts of a man's life should be defeated by the perjury of one man, or indeed any number of men; and much less by his defect of memory or of a discrimination to judge correctly of the party's strength of understanding. For as it is in respect of the fact of execution, so it must be in respect to the capacity of the party deceased, whether the defect be alleged to arise from insanity or the less permanent cause of intoxication. The jury are not confined to the opinions given by the subscribing witnesses on that point, nor to the facts on which they say they formed their opinions, but may take their judgment from other sources on which they rely more. The case of Bell v. Clark, supra, has since been approved in Boone v. Lewis, 103 N.C. 40, where Justice Merrimon
said that the grossest injustice would result if the law was otherwise." "The maker of a will," said the present Chief Justice, "can make an acknowledgment of his signature by words, and if you find there was such acknowledgment that will be sufficient acknowledgment under the law. It must also be witnessed in the presence of the party making the will, and he must either see the witnesses sign it or he must be in position to see them sign it, and to see if they are signing the paper-writing that he signed, . . . they must also sign as a witness at his request. It is not necessary, however, that he should make the request himself. If he authorizes some one else to get witnesses and ask them to sign it, then the party that he sends out will act as agent, and a request made by said person would be the request of the party signing the will." In re Herring's Will, supra. The material portion of the evidence bearing upon this phase of the case is as follows: "She asked us to get a paper so she could make her will. She asked Mrs. Bates to writ it. Stated what she wanted each one to have. Mrs. Bates read it over to her, and she said it was all right and signed it. I signed it at her request. I heard Miss Deyton ask Mrs. (506) Bates to go for her (Miss Stepp) to witness the will. When I signed it Miss Margaret was looking at me. After Miss Stepp came in she was told about the will. I saw Miss Stepp sign. Miss Deyton certainly was in position to see her sign it. The second card, Exhibit `B,' was written in my presence, and Miss Margaret signed it in my presence. Miss Stepp was in the room. This second paper was not signed by Miss Stepp in another room entirely. Both of them were signed in Miss Margaret's presence."
The other attesting witness, Mrs. Annie Stepp Suttles, *Page 533 
notwithstanding her relation to the parties and the cause, testified: "I signed the paper identified as Exhibit `A' as a witness. I also signed the paper identified as Exhibit `B.' I signed the first paper, Exhibit `A,' in the room where Margaret was. I signed the second paper, Exhibit `B,' just across the hall from Margaret's room; in Mrs. Pickens' room. I do not remember whether the doors were open. I signed Exhibit `A' in the room where Margaret was present. The only person that said anything to me about the paper was Mrs. Bates. She told me to sign it. Told me what she wanted me to sign. Miss Margaret was lying on her back in bed. She could see me sign if she had been looking."
The testatrix having requested Mrs. Bates to call Miss Annie Stepp as a witness to her will, and having announced to her in the presence of Miss Deyton that the latter desired her to witness her will, Miss Stepp, in the presence of Miss Deyton, and in clear view of her, signed Exhibit "A" as a witness. As to that portion of the will marked Exhibit "B," the caveator contends that it was not signed by the witness, Annie Stepp, in the presence of the testatrix, and this is the evidence of the witness Annie Stepp, but the other witness, Mrs. Gale, who was entirely disinterested and not related to any of the parties, testified that Miss Stepp signed Exhibit "B," also in the presence of the testatrix.
It was not necessary that the testatrix should have signed the paper, as her will, in the presence of the witnesses, provided she afterwards acknowledged it before them. Burney v. Allen, 125 N.C. 314; Umstead v.Bowling, 150 N.C. 507; In re Herring's Will, supra; In re Cherry's Will,164 N.C. 363. The material issues in a case, raised by the pleadings, should be passed upon by a jury and not by the court, without consent of the parties. Pasour v. Lineberger, 90 N.C. 159; Whitehurst v. Davis,3 N.C. 113; Smith v. Campbell, 10 N.C. 590. Where there is conflicting evidence it should be left to the jury to settle the matter by a finding under correct instructions from the court. In re Snow's Will, 128 N.C. 100;In re Bowling, 150 N.C. 507.
A will has been defined to be a disposition of property to take effect on or after the death of the owner of it. 40 Cyc. 990; and also as the just sentence of our will touching what we would have done (507) with our estate after death. Payne v. Sale, 22 N.C. 457. Exhibit "A" in this case appears to bear evidence of its disposition or character, for it expressly refers to the things given by the maker of it as her "bequests," a word appropriate to a will of property (Smith v. Eason,49 N.C. 34), and it is often employed by the unskilled or unlearned to describe both kinds of property. Her intention to make it her will could fairly be inferred from the language and general appearance of the document. As to the second, Exhibit "B," it has some resemblance to a will or a part of one, was subscribed by the same witnesses, and *Page 534 
executed on the same day as Exhibit "A." The Chief Justice says in the case of In re Edwards, 172 N.C. 369, 371: "No particular form of expression is necessary to constitute a legal disposition of property by will. Although apt words are not used, and the language is inartificial, the Court will give effect to it where the intent is apparent, says Brown, J., in Kerr v.Girdwood, 138 N.C. 473; citing Henry v. Ballard, 4 N.C. 396, and In reBelcher, 66 N.C. 54, to the above purport, that, `Form will be discarded, and has been, so that an instrument in form a deed has been held to be a will.' The subject is fully discussed with ample citation in Morrison v.Bartlett (Ky.), 41 L.R.A. 39. In the notes to this case are many interesting cases in which instruments in the form of a contract, acknowledgments of indebtedness, assignments, endorsements, bank deposits, commercial paper, leases, powers of attorney, orders on executors, and other informal papers are held to be sufficient as wills when the intent sufficiently appears that there is to be a disposition of the testator's property after death." Kerr v. Girdwood, 138 N.C. 473, cited above, is reported with notes in 107 Am. St. 551, which cite Ferris v. Nelville, 89 Am. St. 486, where the subject is fully discussed in a very illuminating monograph. In 40 Cyc. 1091, it is said: "It is not necessary that any particular form of words be used to make a will. Any writing to take effect at death may constitute a will." The power to devise is purely statutory (In re Will of Garland, 160 N.C. 555), and our statute does not require any particular form. The instruments here appear to be of a testamentary character, and if properly identified and linked together as parts of the same instrument, and legally attested, they may operate as the will of the decedent. But the facts must be found by the jury, in order that we may pass upon the validity of the paper-writings as the will of the deceased.
A careful examination of the case convinces us that there was error in virtually withdrawing the case from the jury.
New trial.
Cited: In re Will of Parham, 177 N.C. 111; Spry v. Kiser, 179 N.C. 420;Cook v. Mfg. Co., 182 N.C. 212; In re Fuller, 189 N.C. 511; Tuckerv. Ashcraft, 189 N.C. 547; In re Will of Kelly, 206 N.C. 552; Hood, Comr.v. Bayless, 207 N.C. 84; Richardson v. Cheek, 212 N.C. 511; In re Will ofCoffield, 216 N.C. 287; In re Will of Franks, 231 N.C. 255; Efird v.Efird, 234 N.C. 611; In re Will of Ellis, 235 N.C. 33. *Page 535 
(508)