IN THE MATTER OF THE WILL OF GEORGE H. BROWN.

(Filed 23 November, 1927.)

**1. Appeal and Error—Constitutional Law.**

Under the provisions of our Constitution, Art. IV, sec. 8, the Supreme Court on appeal from an issue of *devisavit vel non*, involved in the trial of a caveat to a will, is confined to a consideration of assignments of error in matters of law and legal inference.

**2. Wills—Caveat—Proceedings in Rem—Parties.**

The proceedings to caveat a will are *in rem*, and not strictly to be regarded as adversary.

**3. Same—Deceased Persons—Transactions and Communications—Statutes —Mental Capacity—Opinions—Party in Interest—Beneficiaries.**

The beneficiary under a will may not testify to transactions and communications with the deceased, C. S., 1795, but he may in proceedings of *devisavit vel non* give his opinion, based on his own observations, as to the mental incapacity of the deceased at the time of the execution of the writing propounded, and then testify to personal transactions he has had with him as being a part of the basis of his opinion, when evidence of this character is properly so confined upon the trial by instructions or otherwise, the weight and credibility being for the jury to determine.

**4. Same—Declarations—Evidence.**

Where there is evidence upon the issue of *devisavit vel non* that the testator had long considered the disposition he desired to make of estate by will, had in fact made a will accordingly providing for certain of his near blood relations whom he held in affectionate regard when admittedly of sufficient mind, it may be shown in evidence upon the issue that in the writing propounded, made more recently before his death, he had left out of consideration these relations and given his entire property to his wife, for whom he had intended to provide to a less extent.

**5. Same—Mental Incapacity.**

Declarations of a deceased person, admittedly made when he was of sound mind and disposing memory, showing a long cherished, settled and unvarying purpose with respect to the disposition of his property by will, are competent, in connection with other supporting evidence, upon the trial of an issue involving his mental capacity at a subsequent date not too remote from the time of the declaration, in which he executed a will in utter variance with such purpose, which is contested upon the ground of mental incapacity.

**6. Same—Inferences.**

Upon the issue of *devisavit vel non* upon the caveat to a will, evidence that the testator should have been aware of his possession of a large estate and was under the erroneous impression at the time he made the will in question, that he was almost without the means of support, is competent upon the question of his mental capacity to have made it, involved in the issue of *devisavit vel non*.

**7. Wills—Mental Capacity.**

A person is in law deemed to have sufficient mental capacity to make a will when he has a clear understanding of the nature and extent of his act, the kind and value of the property devised, the persons who are the natural objects of his bounty, and the manner in which he desires to dispose of it.

**8. Wills—Caveat—Judges Superior Court—Witnesses—Appeal and Error.**

Where during the trial upon the issue of *devisavit vel non* it is made to appear to the trial judge that the testimony of a judge holding the courts of another district is of sufficient importance, it is not error for him, in the absence of the jury, to telegraph this witness, not subject to subpœna, requesting him to arrange his court so as to attend as a witness.

**9. Courts — Discretion — Opening and Concluding Speech — Appeal and Error—Wills—Caveat.**

Upon the trial of an issue *devisavit vel non*, where the evidence is conflicting, the decisions of the trial judge as to whether the propounders or caveators to a will shall open and conclude, is one within his discretion, and is not reviewable on appeal.

Brogden, J., dissenting; Clarkson, J., concurring in dissent.

Appeal by propounder from *Daniels, J.,* at May Term, 1927, of Beaufort. No error.

Proceeding for probate of paper-writing, propounded as the last will and testament of George H. Brown, deceased.

The issue submitted to and answered by the jury was as follows: "Is the paper-writing, dated 5 January, 1926, propounded for probate, and every part thereof, the last will and testament of George H. Brown?" Answer: No.

From judgment on the verdict, propounder appealed to the Supreme Court.

*P. W. McMullan, J. C. B. Ehringhaus, Harry McMullan and Manning & Manning for propounder.*

*Ward & Grimes, H. C. Carter, John H. Bonner and Stephen C. Bragaw for caveators.*

Connor, J. George H. Brown died at his home in the town of Washington, Beaufort County, N. C., on 16 March, 1926. He was born in said town on 3 May, 1850. He was therefore in his seventy-seventh year at the date of his death.

From 1872, when he was duly licensed to practice as an attorney and counsellor at law in this State, until 1889, when he was appointed judge of the Superior Court for the First Judicial District, he was actively and continuously engaged in the practice of his profession. From 1889 to 1905 he served continuously as a judge of the Superior Court. On

1 January, 1905, having been elected to that office at the preceding general election, he began his service as an Associate Justice of the Supreme Court. This service continued for two terms, and ended in 1920, at the expiration of his second term. He did not seek nomination or election for another term. Being then in his seventieth year, he retired from active and continuous work in his profession or otherwise. In 1921 he qualified as a Special or Emergency Judge of the Superior Court, in accordance with the provisions of chapter 125, Public Laws 1921, and thereafter, from time to time, he presided at terms of the Superior Court in various counties of the State, under assignments by the Governor. The last term to which he was assigned, and at which he presided, was the November Term, 1925, of the Superior Court of Beaufort, his native county. During all these years he resided at and made his home in the town of Washington.

An estimate of Judge Brown as a man and as a citizen, and an appreciation of his services to the State, both as a judge of the Superior Court for fifteen years, and as an Associate Justice of the Supreme Court for sixteen years, may be found in the address delivered by the Hon. Robert W. Winston, upon the presentation of his portrait to this Court on 12 April, 1927. See 193 N. C., 859. This portrait was presented to the Court by Mrs. Brown. It hangs in its appropriate place upon the walls of the Chamber in which this Court now sits. In the words of the *Chief Justice,* in his remarks accepting this portrait, Judge Brown has "left for our keeping a record of high service to his State, and a heritage of great worth to his fellowmen."

At his death Judge Brown left surviving, as his widow, Mrs. Laura E. Brown, to whom he was married at Washington, N. C., on 17 December, 1874. They lived together in the intimate relationship of husband and wife for more than fifty years. She is the propounder of the paper-writing offered for probate as his last will and testament, which is dated 5 January, 1926. No children were born of their marriage. His heirs at law are his two surviving sisters, and his nephews and nieces, the children of his two deceased sisters. He was the only brother of these sisters. These heirs at law are the caveators in this proceeding.

The issue which is determinative of this proceeding was submitted to and answered by a jury of Beaufort County, upon evidence consisting chiefly of testimony of relatives and friends, who had known Judge Brown for many years, both while he was strong and vigorous and after sickness and the infirmities of age had rendered him weak and feeble. There was sharp conflict in the opinions testified to by the witnesses at the trial as to the fact involved in the issue, to wit: Judge Brown's mental capacity on 5 January, 1926. Many were of the

opinion that Judge Brown was not of sound mind and memory on said date; many were of opinion to the contrary. The credibility and probative force of all the evidence, including the conflicting opinions of the witnesses as to his mental capacity on 5 January, 1926, were matters essentially for the jury. By their verdict, they have found that the paper-writing, dated 5 January, 1926, propounded for probate, is not the last will and testament of George H. Brown. From the judgment upon the verdict the propounder has appealed to this Court, assigning as errors of the law in the trial of the issue (1) the admission of testimony as evidence over her objection; (2) the instructions of the court to the jury, to which she duly excepted; (3) the rulings of the court as to the conduct of the trial to which she excepted; and (4) the refusal of her motion that the verdict be set aside and a new trial ordered. These assignments of error are duly presented to this Court by propounder's appeal from the judgment. The jurisdiction of this Court conferred by section 8 of Article IV of the Constitution of North Carolina is confined to a consideration of assignments of error in matters of law and legal inference in order that it may be determined whether or not they shall be sustained. *In re Will of Creecy,* 190 N. C., 301.

The evidence tends to show the formal execution of the paper-writing dated 5 January, 1926, by Judge Brown, as his last will and testament. The paper-writing is in form sufficient to constitute a will, bequeathing and devising all his property, real and personal, to his wife, Mrs. Laura E. Brown, "to be hers absolutely in fee simple, including my residence and law office on Market Street, in Washington, North Carolina." Mrs. Brown is appointed executrix to the will. She is the sole devisee and legatee, by the terms of the will, of all the estate of Judge Brown, both real and personal. No reference is made in this paper-writing to his sisters, or to his nephews or nieces.

The uncontradicted testimony of witnesses tends to show that all the requirements of the statute, C. S., 4131, with respect to the execution of said paper-writing, both as a holograph and as an attested will, were complied with. Three witnesses whose credibility or competency is not questioned, testified that the paper-writing and every part thereof is in the handwriting of Judge Brown, whose name is subscribed thereto; there was evidence that the paper-writing was found, after the death of Judge Brown, among his valuable papers and effects in his safety-deposit box in the vault of the Bank of Washington, where it was deposited by Judge Brown on 5 January, 1926. There was evidence also that said paper-writing was written by Judge Brown in his lifetime, and signed by him, and that same was subscribed by two witnesses in his presence, and at his request, no one of whom is interested in the devise or bequest of any property by the said paper-writing.

The court charged the jury that the evidence, if believed by them, established the formal execution of the paper-writing by Judge Brown, as his last will and testament, and that said paper-writing, if so executed by him, is his valid will, unless they should find from the evidence, the burden being on the caveators in that respect, that at the time of its execution Judge Brown did not have the mental capacity which the law requires for the execution of a will. There was no contention, and no evidence tending to show that the execution of the paper-writing as a will, was procured by undue influence. The sole contention of the caveators, with respect to the validity of the paper-writing as a will, is that Judge Brown, at the time of its execution by him, on 5 January, 1926, and continuously thereafter until his death on 16 March, 1926, did not have the capacity to make and execute a will, for that he was not of sound mind and disposing memory at and during said time.

In support of their contention, caveators offered evidence tending to show that prior to 1919, when he was serving his second term as an Associate Justice of the Supreme Court, Judge Brown was strong and vigorous, in body and in mind; that in the spring of 1919 Judge Brown became ill, and that in consequence of such illness he spent some time as a patient in hospitals and sanatoriums; that during this illness he was greatly depressed in spirit and suffered from extreme melancholia, often expressing fear that he would find himself entirely without means for the support of himself and wife, and that he would become a pauper; that he was greatly concerned about his health, frequently expressing apprehension that he would not be able to return to his work on the Supreme Court, with the result that he would be deprived of his salary as an Associate Justice, making it difficult for him to live; that during this illness his mind was unsound and his memory bad. There is evidence that at this time Judge Brown was possessed of a large estate, yielding an income greatly in excess of his salary.

The evidence further tends to show that Judge Brown recovered from this illness, both physically and mentally, and returned to his work on the Supreme Court; he resumed this work and continued to perform his duties as an Associate Justice until his retirement at the end of his second term in 1920. After his retirement from the Supreme Court Judge Brown spent the larger part of his time at his home in Washington in daily association with his wife, his relatives and friends. His physical health was good, and there is no evidence that he was at any time during these years depressed in spirit or in mind.

There is no evidence tending to show that Judge Brown suffered any further illness until the spring of 1925. He presided as Special or Emergency Judge at the March Term, 1925, of the Superior Court of Henderson County, which was a two-weeks term. He became sick dur-

ing the second week of the term and adjourned court on Wednesday.
There was evidence that as a result of this sickness his mind became
confused; he was unable to remember persons with whom he had had
close associations, both official and social, during the court.   Witnesses
who saw him during this term of court testified that in their opinion he
did not, after he became sick, have mental capacity sufficient to enable
him to know what property he had, who his relatives were or what
claims they had upon him by reason of their relationship to him.   A
witness who had known Judge Brown for many years at Washington,
and who was then living in Hendersonville, testified that Judge Brown
was not himself at all while he was in Hendersonville.

After Judge Brown's return from Hendersonville to Washington he
was quite sick for some time.   During the early summer of 1925 he went
with Mrs. Brown to Beaufort, N. C., to recuperate from this illness.
He and Mrs. Brown remained at Beaufort for several weeks.   He was
much improved upon his return to Washington during the latter days of
June.   In August, 1925, he went to Asheville, N. C., as had been his
custom for many years.   He was accompanied by Mrs. Brown, who
remained with him until early in October, when they returned to their
home in Washington.   While in Asheville Judge Brown had trouble
with his eyes and consulted an oculist.   This trouble impaired his sight
and he was much depressed by his inability to read as he had been
accustomed to do.   Mrs. Brown testified that his inability to read was
a great deprivation to him.   From his return to Washington about
October, 1925, to his death in March, 1926, Judge Brown remained at
his home.   There is no evidence that he undertook any work thereafter
except during the November Term of the Superior Court of Beaufort
County.

There was evidence tending to show that after his return to Wash-
ington there was a marked change in Judge Brown's physical appear-
ance.   He became weak and feeble, so much so that when he went out
on the streets of Washington, either for social or business purposes, he
was usually accompanied by Mrs. Brown.   His condition, both physical
and mental, during the fall of 1925, was the subject of much sympa-
thetic comment by relatives and friends, who had known him for many
years.   The contrast in both respects in his condition at this time and
his condition in former years was marked.   Apprehension was felt and
expressed by Mrs. Brown and others that he would not be able to pre-
side at the November Term, 1925, of the Superior Court of Beaufort
County, in accordance with the assignment of the Governor.   Many wit-
nesses at the trial who saw him while presiding at this time, testified
that in their opinion Judge Brown was not only sick in body, at that
time, but also of unsound mind and memory.   These opinions were

formed from personal observation and contrasts made by the witnesses in his appearance and conduct at this time and at former times, when he was both strong in body and vigorous in mind. There were many other witnesses offered by the propounder who testified that while Judge Brown was at the time weak and feeble, his mental faculties had not become impaired. The facts which formed the basis of these conflicting opinions are not in serious controversy; the witnesses differed only in their inferences and conclusions as to Judge Brown's mental condition, and in some instances as to the cause of unusual conduct which they observed.

There was evidence tending to show that Judge Brown was sick during the early days of January, 1926. At this time, on several occasions, Judge Brown expressed apprehension that the General Assembly, which he insisted was then in session, although in fact the General Assembly did not meet during 1926, might repeal the statute under which he was receiving his salary as Special or Emergency Judge; he stated to relatives and friends, repeatedly, that if this was done, he would have no income, as he was dependent upon his salary for his support. The evidence shows that at this time the income from investments made and owned by Judge Brown exceeded $20,000 per annum, and that he was in daily correspondence with banks in which his securities were deposited for safe-keeping. This correspondence shows that Judge Brown was fully advised from time to time as to the total value of his securities, and as to the income from the same.

A few weeks after the execution of the paper-writing by him, Judge Brown became so ill that he was taken to a hospital in Washington. He remained there for several days and was then taken to his home where he remained to the date of his death. His mental condition during this sickness was bad. He was sick continuously until his death, and frequently expressed fear that he would die a pauper. This fear made him very unhappy. The assurances of his relatives and friends that his fear was groundless gave him no relief.

Judge Brown was the only son of his parents, both of whom died when he was a young man. He had four sisters, two of whom are dead. Both left children, who survived Judge Brown. A son of one of the deceased sisters, a nephew of Judge Brown, lives in Washington. He went there from his home elsewhere in the State soon after receiving his license to practice law, at the suggestion and upon the advice of Judge Brown, who had observed with pride and satisfaction his successful career at Washington in his profession. This nephew is married and has several daughters. All the evidence is to the effect that the relations between Judge Brown and this nephew, his wife and daughters, especially after his retirement from office as an Associate

Justice of the Supreme Court in 1920, had been close and affectionate. There was no evidence of any change in their relations at any time prior to 5 January, 1926, or thereafter. There is evidence that on this day, when the paper-writing was executed by Judge Brown, he sent for and consulted this nephew, at his home, about a matter in which he was greatly interested, to wit, the repeal by the General Assembly of the statute under which he was receiving his salary as a Special or Emergency Judge. After Judge Brown's death Mrs. Brown sought the aid and advice of this nephew. None of Judge Brown's other relatives, who are now his heirs at law, lived in Washington. There is evidence, however, tending to show that prior to 5 January, 1926, his relations with them were pleasant and normal. There is no evidence of any change in these relations at any time prior to his death. He had on many occasions manifested for them strong affection, and recognized their claims upon him by reason of their relationship. As late as about 1 October, 1925, in a conversation with Governor McLean, in Raleigh, while on his return trip from Asheville to Washington, Judge Brown said: "I am getting old; my health is bad; I cannot expect to live much longer. I have no children of my own. In recent years, particularly since I have returned to Washington to live, I have become very much attached to Angus' wife and daughters. They have been very kind to me, and while I feel an interest in all my nephews and nieces and their families, I feel a peculiar interest in them. I have made my will, and in my will I have provided especially for Angus' wife and children. I will leave a very nice estate, and with what I have arranged to give them, Angus' daughters will be taken care of handsomely." In this conversation Judge Brown expressed his affection for another nephew and his wife, Mr. and Mrs. Brown Shepherd, saying that although they were well fixed financially, he had provided for them also. This conversation occurred during an interview between Judge Brown and Governor McLean, relative to a matter of great importance to Mr. Angus D. McLean, Judge Brown's nephew, and Governor McLean's cousin. The statements by Judge Brown in reference to his will, and to his nephew's interest in the disposition of his estate, were made in support of his insistent advice upon this matter.

There was evidence tending to show that as long before his death as February, 1924, when he was in his seventy-fifth year, and after he had retired from active professional and business life, Judge Brown was giving careful consideration to the making of his will. This is shown by his correspondence with Mr. Joseph G. Brown and Mr. Reid Martin, bankers, residing at Raleigh, N. C. Mr. Brown was president of the Citizens National Bank and of the Raleigh Savings Bank and Trust

Company. Mr. Martin was cashier of the latter. Judge Brown had accounts with both banks and had securities deposited with each for safe-keeping.

In a letter dated at Washington, N. C., on 26 April, 1924, addressed to Mr. Martin, Judge Brown wrote as follows: "You are a friend indeed, and I am very grateful to you for your many kindnesses to me. I sincerely hope you and J. G. B. will outlive my wife and myself. I hope you will bear in mind, in case anything happens to me, that I have made a new will this week, and it is in Box 40, Bank of Washington. I have one key, and my old clerk here, Arthur Mayo, has the other key. I have devised all my personal estate to Raleigh Savings Bank and Trust Company in trust and appointed that company the sole executor. If you ever hear of my death, you can come down and get the will and probate it here, and qualify as executor for the company. In the will is a little memento of my personal regard for you and J. G. Brown."

In a letter dated at Washington, N. C., on 27 April, 1924, addressed to Mr. Jos. G. Brown, Judge Brown wrote as follows: "I have written my will and filed it in Lock Box 40, Bank of Washington. My entire personal estate is devised to Raleigh Savings Bank and Trust Company in trust to pay entire net income to my wife during her life, except a small annuity to a faithful old servant. After my wife's death, it is to be divided equally between my nephews and nieces; so you see there will not be much trouble in administration. There is a little memento of my personal regard for you and also for Reid Martin. The one P. C. is likely to pan out more than the suggested $3,000, and the three P. C. on annual income of the estate is likely to pay the trustee very well for the trouble of collecting it. In case you hear of my death you will send down and get the will and probate it here. There are a lot of securities in that box and also with W. H. Goadby & Co., New York. I hope you will survive both Mrs. Brown and myself. I am very grateful to you for your great kindness."

In a letter dated at Asheville, N. C., on 5 August, 1924, addressed to Angus D. McLean, Judge Brown wrote as follows: "I intended to talk to you about the subject I am writing about before I left home. . . . It is about my will. I am writing as you and your wife and daughters are largely interested in its present provisions. . . . My will is a holograph, in my deposit box in the Bank of Washington. My handwriting can be easily proven. I give my wife our home place and contents in fee. After an annuity to Pauline, I bequeath my entire personal estate to the Raleigh Savings Bank and Trust Company as trustee to handle same, and pay entire income to my wife during her life. I also give her the power to make a will and dispose of as much as fifty thousand

of my estate in any way she may wish. After her death I bequeath a substantial legacy to said trustee for each of your daughters to be kept at compound interest and paid over as each daughter arrives at 21 years of age. If any die before then, her legacy to be divided among the surviving sisters. I also give your wife a nice legacy in token of my sincere love for her. The residuum of my estate is to be divided per capita among my nephews and nieces. The share going to Brown Shepherd and Eleanor C. Whitney to be retained until death of their respective mothers, and income paid to the mothers during their lives. I have tried to be fair to all my relatives, but as your lovely girls, whom I dearly love, are not my nieces, but my great nieces, I have given them specific legacies. My wife has been dealt with so liberally that I am sure she will not dissent, but if she does, your girls and Nettie will get their legacies anyway."

In a letter written at Washington, N. C., dated 24 March, 1925, addressed to Joseph G. Brown at Raleigh, N. C., Judge Brown made this reference to his will: "As you know, I have left my somewhat large estate to the Raleigh Savings Bank and Trust Company because of my profound confidence in you particularly, and I will also say, because of my confidence in Martin."

There are references to this will in letters written by Judge Brown, subsequently, to Mr. Martin dated 25 April, 1925, and to Mr. Brown, dated 3 July, 1925; also in letter written at Asheville, dated 3 September, 1925, addressed to Angus D. McLean, at Washington, N. C. In this last letter Judge Brown advises strongly that Mr. McLean do not consider a suggestion as to a change of residence, and as one reason for his advice says: "Besides as you know, my will devises a very substantial part of my estate to your wife and daughters. I can hardly endure the thought of all of you leaving Washington."

The evidence shows that as late as 1 October, 1925, Judge Brown in his interview with Governor McLean referred to his will, previously executed by him, in which he had bequeathed and devised his estate, after the death of Mrs. Brown, to his nephews and nieces, with provisions for his surviving sisters. There is no evidence showing or tending to show any change thereafter in his relations to his nephews and nieces, or to his sisters, or any change in the condition or value of his estate. There is evidence of a marked decline in Judge Brown's physical condition, after his return to Washington, and during the fall and winter of 1925. Rev. S. A. Cotton, presiding elder of the Weldon District of the North Carolina Conference of the Methodist Church, who had known Judge Brown for many years, testified as follows: "I had known Judge Brown prior to the fall of 1925. I had been impressed with his mental and physical stamina; he was a strong man,

mentally. In the fall of 1925—during October and November—I noticed a difference in Judge Brown. I was impressed with a marked change in his mental condition; the change was for the worse. I was impressed that Judge Brown was losing his grip, mentally, to put it that way. I got that impression from observation and from conversations with him."

There is evidence that the marked decline in physical strength and mental vigor was accompanied by great mental depression, manifesting itself chiefly in loss of memory and inability to realize at times that he was possessed of an estate, of large value, yielding an annual income exceeding $20,000. In a postscript to a letter, dated 25 December, 1925, addressed to Mr. J. G. Brown, Judge Brown says: "As I seem to be at present physically and mentally incapable of properly managing my business affairs, I wish to say that I would regard it as a great favor if I could induce you to take charge of them for me, as I have the utmost confidence in your absolute integrity and business ability." On 2 January, 1926, in a letter to his nephew, Mr. Brown Shepherd, at Raleigh, speaking of his great need of money, he says: "I am not drawing any salary." At this time he was receiving monthly his salary as a Special or Emergency Judge.

On or shortly before 5 January, 1926, Judge Brown, with his own hand, wrote the paper-writing now offered for probate as his last will and testament. He therein gives, bequeaths and devises to his wife all his estate, making no reference therein to his nephews or nieces, or to his sisters. The only property specifically referred to in this paper-writing is his residence and law office, shown by the evidence to be worth about $15,000 and $5,000, respectively. No reference is made therein to the stocks, bonds and securities which he then owned, and which exceeded in value $500,000. These stocks, bonds and securities were then on deposit for safe-keeping with the Citizens National Bank of Raleigh, the Raleigh Savings Bank and Trust Company, the Bank of Washington and W. H. Goadby & Co., bankers, New York City. Judge Brown's correspondence shows that he was informed as to these stocks, bonds and securities, and that his repeated requests for itemized statements from each of the depositaries had been promptly complied with.

Mr. A. D. McLean, nephew of Judge Brown, and one of the caveators, testified that he saw Judge Brown at his home, on the morning of 5 January, 1926. At that time Judge Brown knew him and knew Mrs. Brown; he knew he had a house and lot, and an office in Washington; in the opinion of the witness, this is all that he knew about his property. He further testified that in his opinion Judge Brown on this day did not know what property he owned; that he did not have sufficient

capacity, if he remembered his relatives, to recall his feelings toward them, or to recall the fact of his relation to them; he did not then have sufficient capacity to understand the scope and effect of a will.

The witness further testified that he had formed this opinion by contrasting Judge Brown's condition, physical and mental, on that day, with his condition in former years, when he regarded Judge Brown as one of the ablest lawyers and business men that he had known. The witness gave in detail the results of his observation of Judge Brown from 1919, when he first became ill, to his last illness, immediately preceding his death. He testified that in August, 1924, he received through the mail, at Washington, a letter dated at Asheville, N. C., on 5 August, 1924. The letter is in Judge Brown's handwriting, and is addressed to the witness. In the opinion of the witness, Judge Brown was at that time of sound mind and memory. The witness' opinion that Judge Brown was of unsound mind on 5 January, 1926, was based, in part, by contrasting his purposes and intentions with respect to the disposition of his property at his death, as expressed in this letter, written when Judge Brown was sound in mind, with the disposition made in the paper-writing dated 5 January, 1926, when it is contended he was of unsound mind.

To the introduction of this letter in evidence by the caveators, the propounder objected. The objection was overruled, and the jury was instructed by the court that the letter was admitted in evidence, to be considered by them in connection with other testimony of Mr. McLean, as showing the basis of his opinion with respect to Judge Brown's mental condition on 5 January, 1926. Propounder excepted to the admission of this letter and to the instruction of the court with respect to its consideration by the jury.

Mr. McLean further testified to a conversation with Judge Brown, in his office at Washington, in July, 1925, upon Judge Brown's return from Beaufort. Propounder's objection to this testimony was overruled; the jury was instructed that it was admitted for the same purpose and under the same limitation as the letter. The witness testified that his opinion as to Judge Brown's mental condition was formed in part by contrasting what Judge Brown then said to him relative to his intention with respect to his property, with the disposition made in the paper-writing propounded as his will.

In this State a proceeding for the probate of a paper-writing as a will is not regarded as an adversary suit *inter partes,* but as a proceeding *in rem.* *Edwards v. White,* 180 N. C., 55, citing and approving *Powell v. Watkins,* 172 N. C., 244. There are no parties to such a proceeding, certainly none who can withdraw or take a nonsuit, and thus put the matter where it was at the start. *Collins v. Collins,* 125

N. C., 98. When the probate of a paper-writing as a will is contested, it is the duty of the court to cause an issue of *devisavit vel non* to be submitted to a jury. Strictly speaking, there are no parties to such an issue; both propounders and caveators are equally actors, in obedience to the order of the court directing the submission of the issue. *Enloe v. Sherrill,* 28 N. C., 213. In the opinion of the Court, *In re Bowling,* 150 N. C., 507, it is suggested that in view of the fact that there are no parties, in the usual sense of the term, the proceeding should be entitled, "In re the Will of ................." This suggestion has been generally adopted, as in this proceeding.

It has been consistently held by this Court, however, that in a proceeding for the probate of a will, both propounders and caveators are parties within the meaning and spirit of C. S., 1795, which disqualifies a party or person interested in the event from testifying as a witness in his own behalf against the executor, administrator or survivor of a deceased person, concerning a personal transaction or communication between the witness and the deceased, except where the executor, administrator or survivor is examined in his own behalf, or where the testimony of the deceased person is given in evidence concerning the same transaction or communication. *In re Mann,* 192 N. C., 248; *In re Chisman,* 175 N. C., 420; *In re Harrison,* 183 N. C., 457; *Pepper v. Broughton,* 80 N. C., 251.

Notwithstanding this principle, Judge Brown's letters to Mr. A. D. McLean, one of the caveators who had testified that in his opinion Judge Brown was not of sound mind on 5 January, 1926, and the conversations between Mr. McLean and Judge Brown, as testified to by the former, were properly admitted in evidence upon the principle stated in *McLeary v. Norment,* 84 N. C., 237, and approved in many opinions subsequently delivered by this Court. *In re Hinton,* 180 N. C., 207; *Bissett v. Bailey,* 176 N. C., 43; *In re Chisman,* 175 N. C., 420; *Rakestraw v. Pratt,* 160 N. C., 437. This is true with respect to the letters even if it be held that they are personal communications or transactions between Judge Brown and Mr. McLean. All these letters were admittedly in Judge Brown's handwriting or signed by him; they were all received by Mr. McLean through the mail. It might well be held that the testimony of Mr. McLean with respect to the receipt by him of the letters, through the mail was not as to personal transactions with Judge Brown. *McEwan v. Brown,* 176 N. C., 249, and cases there cited.

It has been generally held that declarations, oral or written, by the deceased may be shown in evidence upon the trial of an issue involving his mental capacity, whether such declarations were made before, at or after the date on which it is contended that the deceased was of unsound mind. *In re Burns' Will,* 121 N. C., 337. It has also been held that a

witness who has had opportunity to observe the deceased, may give in evidence his opinion as to his mental capacity. *Clary v. Clary,* 24 N. C., 78. Either a propounder or a caveator may testify as to his opinion upon this question. It was held in *McLeary v. Norment, supra,* that where a witness had testified to a want of mental capacity in the grantor to make a deed, and that his opinion was formed from conversations and communications between the witness and the deceased, it is competent to prove the facts upon which the opinion was formed. Hence, the witness may testify to his conversations and communications with the deceased, when such conversations and communications are in part the basis of his opinion, in order that the jury may determine what weight his opinion, based on these conversations and communications, is entitled to in their consideration of the opinion as evidence. A caveator, although a party to the proceeding, and interested in its event, may give in evidence his opinion as to the mental capacity of the deceased, based upon conversations or communications with him. Having done so, it is competent for him to testify as to the conversations and communications. The learned trial judge was careful to observe this principle and to instruct the jury accordingly. Assignments of error based upon exceptions to the admission of evidence, and to the instructions of the court, with respect to the consideration of certain evidence admitted cannot be sustained. It must be assumed that the jury, in considering Mr. McLean's testimony with respect to his personal transactions and communications with Judge Brown, were mindful of the court's instructions. There was other evidence, unobjected to, tending to show Judge Brown's intentions with respect to the disposition of his property, when he was admittedly of sound mind and disposing memory.

We have read the entire charge of the learned judge who presided at the trial of the issue submitted to the jury in this proceeding. It is set out in full in the statement of the case on appeal. The contentions of both propounder and caveators as to the facts which each contends the jury should have found from the evidence, and as to the law applicable to these facts, are stated therein, fully and fairly. With respect to the principles of law involved in the issue, the instructions given to the jury are in many instances in the identical language used by this Court in opinions in which these principles are stated and discussed. All the instructions are in full accord with well-settled principles, and are fully supported by authoritative decisions of this Court. We find no confusion or inconsistency in the statements of the law or in the instructions with respect thereto, as contended in the brief filed in this Court in behalf of the propounder. Assignments of error based upon exceptions to instructions to the jury, or upon exceptions to the failure

to give instructions requested by propounder, are not sustained. There is no error in either respect.

There is no error in the instruction to the jury to the effect that in considering the question of testamentary capacity involved in the issue, the jury should consider the evidence tending to show that when Judge Brown was admittedly of sound mind and disposing memory, he had expressed intentions with respect to the disposition of his property and estate by will, which he then stated he had theretofore executed, utterly at variance with the disposition made in the paper-writing offered for probate, dated 5 January, 1926, when, it is contended, he was not of sound mind and disposing memory, and that if they should so find the facts to be, such variance, although not alone sufficient to prove incapacity to make a will, was a fact or circumstance to be considered by the jury in determining whether or not Judge Brown had mental capacity to dispose of his property and estate on 5 January, 1926. Declarations of a deceased person, made when he was of sound mind and disposing memory, showing a long-cherished, settled and unvarying purpose with respect to the disposition of his property by will, are competent as evidence upon the trial of an issue involving his mental capacity at a subsequent date, not too remote from the time of the declarations, on which he executed a will, in utter variance with such purpose, which is contested upon the ground that there was a want of testamentary capacity.

The record in this case, viewed in its entirety, does not present the bare question whether the contrast between two natural and reasonable acts or expressions, constitute evidence of insanity or of lack of testamentary capacity, simply because they are different in effect and are separated in point of time. That there is such a difference is merely a circumstance, which with other facts and circumstances appearing from all the evidence, may be considered by the jury in determining the question involved in the issue. In the absence of such other facts and circumstances, such difference alone would not be sufficient as evidence of insanity or lack of testamentary capacity at the date of the last act or expression.

There is no error in the instruction to the jury to the effect that in considering the question of testamentary capacity involved in the issue, the jury should consider the evidence tending to show that Judge Brown's estate, on 5 January, 1926, consisted of his residence, and his office, worth about $15,000 and $5,000, respectively, and of stocks, bonds and securities, exceeding in value $500,000, yielding a net income of more than $20,000 per annum, and that while the extent, character and value of his property is not alone determinative of the question of testamentary capacity, such extent, character and value may properly be

considered in determining whether or not Judge Brown was of sound mind and disposing memory when he wrote and signed the paper-writing dated 5 January, 1926. *In re Staub's Will,* 172 N. C., 138, this Court approved the following definition of testamentary capacity: "A person has testamentary capacity within the meaning of the law, if he has a clear understanding of the nature and extent of his act, of the kind and value of the property devised, of the persons who are the natural objects of his bounty, and of the manner in which he desires to dispose of the property to be distributed." See *In re Will of Creecy,* 190 N. C., 301, and cases therein cited. The converse of this statement must necessarily be the law.

Nor is there error in the instruction to the jury to the effect that in considering the question of testamentary capacity involved in the issue, the jury should consider the fact that by the paper-writing offered for probate, dated 5 January, 1926, Judge Brown bequeathed and devised all of his property, real and personal, to his wife, absolutely and in fee simple, and that his sisters, and nephews and nieces, who are his heirs at law, and the natural objects of his bounty, by reason of ties of blood and affection, take no part of said property or estate. There was no error in this instruction, especially in view of the evidence tending to show declarations of Judge Brown, made when he was admittedly of sound mind and disposing memory, that in recognition of his relations to his sisters, and nephews and nieces, he had provided by his will for them, out of his "somewhat large estate."

The question as to whether Judge Brown was sane or insane, on 5 January, 1926, when he executed the paper-writing propounded as his will, is not necessarily involved in or determinative of the issue submitted to the jury. The question is, whether or not he had testamentary capacity. It is not required that a caveator shall prove that the deceased was insane in order to establish a want of testamentary capacity. The trend of judicial opinion on this subject shows clearly that a distinction should be and is made between insanity and want of testamentary capacity. A man may be lacking in testamentary capacity, as defined by the law, and yet not insane, certainly within the ordinary meaning of that term. The law requires that he shall be sound in mind, and of disposing memory in order to have capacity to make a will disposing of his property, at his death, otherwise than as the law directs in case of his intestacy with respect to the disposition of his property.

Propounder's assignment of error based upon her exception to the sending by the court of a telegram to Judge Grady, requesting his attendance at the trial as a witness for caveators, manifestly cannot be sustained. The telegram was written and sent from the courtroom in the absence of the jury. Counsel for caveators had stated to the court

that they had learned since the trial began that Judge Grady was a material witness in their behalf. Judge Grady, who was then presiding in the Superior Court of Warren County, was not subject to subpœna as a witness. His deposition could not be taken during the trial, without the consent of propounder. This was refused. His Honor felt justified, in view of these facts, in requesting Judge Grady to leave his court and attend the trial in order that the jury might have his testimony upon the trial of the issue. Propounder has no just cause of complaint with respect to this matter.

The ruling of the court that the caveators should open and conclude the argument to the jury is not subject to exception. This was a matter to be determined by the court in the exercise of its discretion. It was so held in *In re Peterson Will,* 136 N. C., 13. The fact that there had been no probate of the will in common form cannot affect the discretion of the court with respect to this matter. The trial of the issue *devisavit vel non,* in a proceeding for probate in solemn form, is *de novo.*

The record upon this appeal contains 752 printed pages. There are 121 assignments of error, based upon exceptions duly noted. Full and exhaustive briefs have been filed in this Court by learned and diligent counsel. Each of the assignments of error has had our full and careful consideration. Manifestly, they cannot be set out and discussed in detail in this opinion.

We have found no error in the trial of the issue in matters of law or legal inference. As was said by *Justice Clarkson,* speaking for the Court *In re Will of Creecy,* 190 N. C., 310, where there was an appeal by a propounder from a judgment on an adverse verdict: "The case was carefully tried in the court below, in accordance with the law. It is not our province to determine whether the verdict of the jury is just or unjust; that is a matter solely for the jury. Under our law, the jury are the triers of the facts and are presumed to be men of good moral character and of sufficient intelligence." There is no suggestion to the contrary in this record, with respect to the jurors, to whom the issue was submitted and by whom the verdict was rendered. The judgment is affirmed. There is

No error.

BROGDEN, J., dissenting: This case has been given earnest and careful consideration by the Court, and the opinion sets forth clearly the conclusion reached and the reasons supporting it. However, I cannot escape the conviction that there is vital error upon the record affecting not only the merits of this particular case, but involving also the method or standard by which testamentary capacity may be determined.

A brief survey of the facts is perhaps necessary to develop the proposition of law which I think was erroneously applied by the trial judge.

On 5 August, 1924, the testator wrote to his nephew a letter in regard to a will. The pertinent part of this letter is as follows: "I give my wife our homeplace and contents complete. After an annuity to Pauline, I give my entire personal estate to the Raleigh Savings Bank and Trust Company, as trustee, to handle same and pay entire income to my wife during her life. I also give her the power to make a will and dispose of as much as fifty thousand of my estate in any way she may wish. After her death I bequeath a substantial legacy to said trustee for each of your daughters to be kept at compound interest and paid over as each daughter arrives at 21 years of age. If any die before then her legacy to be divided among the surviving sisters. I also give your wife a nice legacy in token of my sincere love for her. The residuum of my estate is to be divided per capita among my nephews and nieces. The share going to Brown Shepherd and Eleanor C. Whitney to be retained until death of their respective mothers and income paid to the mothers during their lives. I have tried to be fair to all my relatives, but as your lovely girls, whom I dearly love, are not my nieces, but great nieces, I have given them specific legacies. My wife has been dealt with so very liberally that I am sure she will not dissent, but if she does, your girls and Nettie will get their legacies anyway." At the time this letter was written the testator was admittedly sane. On the 5th day of January, 1926, the testator executed a new will bequeathing and devising all of his real and personal property to his wife. This paper-writing is the subject of the controversy.

The trial judge permitted the letter of 5 August to be offered in evidence and read to the jury. The witness, Mr. A. D. McLean, had previously testified that in his opinion the testator did not have sufficient testamentary capacity on 5 January, 1926. When the letter of 5 August was offered in evidence the propounder objected. The witness was asked this question: "Do you base your opinion of his mental condition on 5 January, 1926, in whole or in part on that letter?" The witness answered, "No. I will say so as to be understood: *I know from this letter* and from other sources that on 5 January, 1926, in my opinion the will does not represent what Judge Brown intended. My opinion of his condition on 5 January, 1926, *is in part based on this letter*, . . . but it is not the only basis of my opinion. *It is a part of the basis for my opinion*, . . . *but the letter enters into my opinion and forms part of the basis of that opinion* in connection with other facts. *I know from the letter* and otherwise what Judge Brown intended to do with his estate." The record shows this entry: "The court admits the letter in evidence in support of or as a basis to Mr.

IN RE WILL OF BROWN.

McLean's opinion, in connection with other circumstances as to the mental capacity of Judge Brown." The record further shows this entry: "The letter is read. The jury is instructed by the court that this letter is offered in evidence in connection with other testimony of Mr. McLean with reference to the grounds upon which he forms the opinion of the mental condition of Judge Brown, and that the jury will consider it for no other purpose." It further appears that the witness, McLean, was permitted to testify as to a conversation with the testator in July, 1925. The propounder objected. The record shows this entry: "Propounder objects to all of this line of testimony, and asks for a preliminary examination. The court rules that it may be had in cross-examination and admits this testimony in the same way and *for the same purpose for which the letter was admitted,* witness having stated to the court that the conversations with Judge Brown *and the letter received from him form a part of the basis for his opinion that Judge Brown was mentally incompetent on 5 January, 1926, as stated."*

Thereafter the trial judge arrayed the contentions of the caveators with respect to the alleged will referred to in the letter of 5 August, 1924, and charged the jury as follows: "The court charges you, upon these contentions, that it is the right and duty of the jury to consider them and to *contrast the two alleged wills as bearing upon the issue of mental capacity* and the testamentary disposition which Judge Brown made or intended to make of his property." Again the trial judge charged: "The court charges you that a desire on the part of Judge Brown, if you find from the evidence it existed, that the bulk of his estate should ultimately go to his own people, namely, his nieces and nephews, was not unnatural or unreasonable, but both natural and proper, if in accordance with his wishes, and if you find from the evidence by its greater weight, that the desire to avoid dissent by his wife existed on his part, that he intended the bulk of his estate to go to his own people, but wished it during her lifetime and for her and their benefit and protection to be administered by said Bank and Trust Company, as trustee or executor, the same should be considered by the jury as bearing upon the issue of mental capacity on 5 January, 1926, when the alleged last will was made."

It is apparent from the portions of the record quoted that the letter lies at the heart of this case. The caveators took the position that the letter showed a totally different testamentary intention from that expressed in the last will of the testator, and it was used throughout the trial as one of the standards of testamentary capacity by which to measure the validity of the will of 5 January, 1926. If the introduction of this letter was error, it was therefore grievous and disastrous so far as the propounder was concerned.

As pointed out in the opinion of the Court, it is undoubtedly established law in this State that a nonexpert witness may give in evidence his opinion as to the mental capacity of a testator, and where this opinion has been formed from declarations or communications between the witness and the deceased, it is competent to offer in evidence the facts constituting the basis of the opinion. The Court declares the law as follows: "It has been generally held that declarations, oral or written, by the deceased may be shown in evidence upon the trial of an issue involving his mental capacity, whether such declarations were made before, at or after the date on which it is contended that the deceased was of unsound mind." The witness testified that the letter of 5 August, 1924, constituted "a part of the basis" of his opinion as to the mental incapacity of the testator on 5 January, 1926. The court admitted it, and stated to the jury that it was admitted because it constituted a part of the ground of the opinion of mental incapacity entertained by the witness. Now the declaration of 5 August, 1924, upon its face, was the perfectly sane declaration of a perfectly sane man. Can a sane declaration of a sane man be evidence of insanity? Can life be evidence of death? Can light be evidence of darkness? Can health be evidence of sickness? Can sanity be evidence of insanity? To my mind to ask these questions is to answer them in the negative. I conceive the law to be that the declarations of a testator made prior to the execution of a will, in controversy, are admissible in evidence upon the question of mental capacity, but such declarations must of themselves contain evidence of mental disorder or bear upon their faces the indelible stamp of mental impairment. I think, too, that the law of this State supports this contention. The two leading cases upon the subject of declarations are *McLeary v. Norment*, 84 N. C., 237, and *In re Burns' Will*, 121 N. C., 337. Both of these cases are relied upon in the opinion of the Court. In the *Norment case* the action was brought to set aside a deed made on 2 February, 1867, upon the ground of mental incapacity and undue influence. A witness, Harriet Alexander, was permitted to testify as to her opinion of her aunt's mental capacity to make a deed, stating that the grantor had been mentally incapable since a stroke of paralysis in 1859. The witness testified that her opinion was formed from conversations and communications between them. The witness was asked to give the basis of her opinion, and this testimony was excluded, and for the rejection thereof the Court granted a new trial. Therefore, it did not appear in that case that the declarations themselves bore evidences of mental disorder. However, the record in that case discloses that another witness testified that in 1865, prior to the making of said deed, the conversations of the grantor "were vague and meaningless. Her conversations were incoherent." Another witness testified that

upon one occasion prior to the date of the deed, she was invited to the home of the grantor for dinner, and that the grantor spoke of carving the turkey when there was no turkey on the table to be carved. Thus, the original record in the *Norment case* discloses unmistakably that the declarations referred to were themselves messengers of legal incapacity.

In the *Burns' Will case* numerous witnesses were examined, who gave their opinion as to the insanity of the testator existing long before the date of the will. These opinions were based upon the "conduct and language of the testator at different times." An examination of the record in that case discloses that in all of these conversations and declarations the unmistakable element of a deranged mind was present. For instance, a witness testified that the testator Burns talked "foolishly"; that he said the witches were after him, and he had put tar on his fence and gates to keep them off. The other cases, as a matter of fact, state the general proposition of law, with perhaps variant wording, as announced in the *Norment* and *Burns cases*.

I think, therefore, that the *Norment* and *Burns cases,* when read in the light of the facts contained in the original records, clearly establish the principle for which I contend. I apprehend that the confusion in the law is due to the fact that in the majority of the cases undue influence and mental incapacity were both involved. It may be that the fact that a testator made one will at one period and a later will at another period different from the first might be used as an intimation or inference of undue influence, but undue influence does not flow from a diseased mind, but from a perfectly normal mind, the current of which has been bent and diverted by overwhelming and dominating pressure from without. Hence, a declaration made at one time, showing a particular testamentary intent, and thereafter a will is made showing a totally different testamentary intent, might be considered as evidence, in cases of undue influence, tending to show the warping of the mind by the unlawful and fraudulent force applied from without. But I know of no case applying the principle solely to mental capacity.

The declaration contained in the letter of 5 August, 1924, was treated by the court as a will. If so, it was entirely sensible upon its face and the disposition of the estate to nieces and nephews was proper and natural and had the full sanction of the law. The will of 5 January, 1926, was also entirely sensible upon its face, and the disposition of the estate to the wife of the testator was proper and natural and had the full sanction of the law. *In re Peterson,* 136 N. C., 13.

The trial judge instructed the jury: "Contrast the two alleged wills as bearing upon the issue of mental capacity." In the first place, how can the contrasting of two wholly sensible documents, each having the equal sanction of the law, constitute any evidence of mental impair-

In re Will of Brown.

ment or warrant any inference of a diseased mind? But there is a graver aspect. The word "contrast" used by the trial judge means to point out or observe differences. Now what is the fundamental difference between the two documents? Obviously, the devise of the bulk of the estate to nieces and nephews in the first will and the devise of the whole estate to the wife in the last. In short, the controlling difference was the fact that the wife received a small portion in the first and the entire estate in the second. So that, when the trial judge instructed the jury, in effect, that it was the duty of the jury to consider the difference between the two documents upon the question of testamentary capacity, it was clearly equivalent to charging that the fact that the testator gave his entire estate to his wife, thereby excluding his blood kin, was at least a circumstance tending to show mental incompetence. An examination of the method of arraying the contentions of the parties in this particular, I think, produces this conclusion as unerringly as the flight of a martin to his gourd or a bee to his hive.

The law, as I understand it, is to the contrary. For instance, in *Peterson's case, supra,* this Court said: "In the light of the experience and observation of men of the best judgment and soundest minds, we can see nothing in the fact that this man gave his estate, the produce of their joint industry and economy, to his wife, tending to show mental incapacity or undue influence."

It would serve no useful purpose to thresh over the authorities or to draw out the debate upon this case. I only intended a brief statement of my conviction that the case has not been tried in accordance with law and the reasons for such conviction.

CLARKSON, J., concurring in dissent: The majority opinion is written with care and thought commensurate with the importance of the controversy. In this jurisdiction there is an impenetrable wall between the law and the facts. The facts to be ascertained by the jury. This Court lays down, perhaps for all time, precedents in the law. The present case goes beyond what has ever before been decided by this Court.

In the main opinion is the following statement: "The record in this case, viewed in its entirety, does not present the bare question whether the contrast between two natural and reasonable acts or expressions, constitute evidence of insanity or of lack of testamentary capacity, simply because they are different in effect and are separate in point of time. That there is such a difference is merely a circumstance, which with other facts and circumstances appearing from all the evidence, may be considered by the jury in determining the question involved in the issue. In the absence of such other facts and circumstances, such

difference alone would not be sufficient as evidence of insanity or lack of testamentary capacity at the date of the last act or expression."

This statement is the crucial point of the difference. The *contrast,* if permissible, which I think not, is not made in the charge *"merely a circumstance,"* but the *"right and duty"* to consider it upon mental capacity. The learned and careful judge who tried this case did not prepare the part of the charge hereinafter referred to. It was prepared by caveators and one of their prayers for instruction is as follows: "It is true, as contended by propounders, that a man may make a will and then revoke or change it by a later one. In reply to this, caveators contend that in April, 1924, less than two years before his death, Judge Brown made a will which fully and reasonably disposed of his large estate and put it in safe and competent hands, recognizing his moral and legal obligations in respect of his estate and providing for all those having claims upon him and it. They contend that this will represented his seasoned judgment and long experience; that it was carefully thought out and prepared, as disclosed by letters in evidence, and safeguarded both the bulk of the estate and the income therefrom; that this income amounts to about $25,000 per year, and is practically free from taxation; that this entire income was devised to his wife for her lifetime, to do with as she pleased, and in addition she was given the residence with household furniture and effects in fee simple, together with the absolute right of disposing of $50,000 more as she saw fit by her will, thereby making full and ample provision for her. They contend further that this will of April, 1924, recognized and provided for the old colored woman, Pauline, who served in his household for fifty years or more, giving her a legacy of $200 in cash and $40 per month for her support; that to Mr. Arthur Mayo, who had acted as his clerk or business agent for many years, he gave the office on Market Street in recognition of long friendship and faithful service, and that the giving of this office to Mr. Mayo did not impair or appreciably diminish the annual income of about $25,000 to his wife; that instead of vesting absolute title to the bulk of his estate in his wife or his relatives, he instead vested it in the Raleigh Savings Bank and Trust Company for her and their benefit and protection, to the end that the estate might be carefully safeguarded; that he was careful to anticipate the cost of administration and made a contract with this Savings Bank and Trust Company, with which he had dealt for many years, about commissions or fees; that in this will of April, 1924, he did not forget Mrs. A. D. McLean and her children, of whom he was very fond, but left substantial legacies for them, and that the residue or remainder of his estate was given to his nephews and nieces per capita, that is, share and share alike; the income from the shares of Brown Shepherd, a

nephew, and Eleanor Whitney, a niece, to go to their mothers, Mrs. Shepherd and Mrs. Crabtree, during their lives, respectively; that this will was deposited in his box in the Bank of Washington and his close business friends and confidential advisers, Jos. G. Brown and W. Reid Martin, of Raleigh, were duly notified to that effect, and that upon the death of Judge Brown, Mr. Joseph G. Brown came to Washington expecting to find and probate this will, never having been informed of any change; and in contrast with this carefully thought and well prepared will, as they contend, caveators point out that the alleged will of 5 January, 1926, while in sufficient legal form to pass as a will, is badly drawn, executed in less than two and a half months before Judge Brown's death, after he had become feeble in body and mind, and that it is entirely different both in form and in fact from what Judge Brown really intended and desired to do with his property. The court charges you, upon these contentions, *that it is the right and duty of the jury to consider them and to contrast the two alleged wills as bearing upon the issue of mental capacity and the testamentary disposition which Judge Brown made or intended to make of his property.*"

The basis of this first alleged will had its primary foundation in a letter of Judge Brown, dated 5 August, 1924. At that time he was conceded to be sane and of disposing mind. In this letter he states "Of course you will regard this letter as strictly confidential and destroy it. . . . God's will be done, but when my time comes I hope I may pass out quickly." This request "destroy it" may mean that he left open the idea of a change in the future. The caveators, with remarkable legal skill and ability in a request to charge, took this alleged will founded on the letter as a basis, with ingenuity stated almost as a fact, although set forth as a contention, as follows: *"which fully and reasonably disposed of his large estate—put it in safe and competent hands—recognizing a moral and legal obligation—his seasoned judgment and long experience—carefully thought out and prepared—safeguarded—making full and ample provision"* for his widow—*"provided for the old colored woman"* and Mr. Arthur Mayo, *"in recognition of long friendship and faithful service,"* giving him the office on Market Street. Then in the contentions was humanly stated *the call of the blood relations.* The powerful array of contentions was striking and in language hard to excel. The *contrast* was demanded between this and the will of 5 January, 1926, with only this short statement: *"While in sufficient legal form to pass as a will is badly drawn,"* *"executed two and a half months before Judge Brown's death,"* and then stating the contrast contention as a fact, *"after he became feeble in body and mind,"* and that it is entirely different both in form and in fact from what Judge Brown really

*intended and desired to do with his property."* What are the facts which, if permissible, should be contrasted in favor of propounders?

The alleged will of 5 January, 1926, is as follows:

"Know all men that I, George H. Brown of Washington, Beaufort County, No. Ca. do make & declare this to be my last will and testament; I bequeath & devise to my dear wife Laura E. Brown all my property real & personal to be hers absolutely in fee simple including my residence & law office on Market Street in Washington, No. Ca.

"This Jany. 5, 1926. I also appoint my said wife Executrix to this will without her giving any bond.                         GEO. H. BROWN.
                                                    "GEORGE H. BROWN.

"Witness: JESSE B. ROSS.
"Witness: WM. B. HARDING.
"We have signed this will of Geo. H. Brown in his presence as witnesses, and in his presence and in the presence of each other.
                                                    "WM. B. HARDING.
                                                    "JESSE B. ROSS."

On back of will:
"Last Will and Testament of George H. Brown of Beaufort County, N. C. Made Jany. 5, 1926. GEO. H. BROWN, 1926.

"Deposited in my lock box among my valuable papers. This Jany. 5, 1926. GEO. H. BROWN, Witness J. B. Ross."

On envelope:
"Geo. H. Brown Last Will and Testament. Filed in this box with my valuable papers. This Jany. 5, 1926. GEO. H. BROWN."

It was in Judge Brown's handwriting—legible. The two witnesses to the will testified that when Judge Brown signed it and they witnessed it, it was done as the writing on the will indicated, and they testified in substance that, in their opinion, he had sufficient mental capacity to know what property he owned, to know his relatives, to know and appreciate the claims, if any, which they had upon him, and if he desired to make a will to know and understand the scope and effect of such testamentary disposition.

He left his property to *"my dear wife,"* who had been married to him for half a century. The will was most carefully drawn and according to the law of this State, was both a written and holograph will. In caveators' contentions, as above set forth, a graphic picture is drawn in the interest of the blood relations which practically negatives the claim of the wife who had been his helpmeet for a half century and made it possible, no doubt, by economy, self-denial and thrift, to help accumulate the fortune.

Know all men that I, George H. Brown of Washington town, Beaufort County, No. Ca. do make & declare this, to be of my last will & testa-ment: (I bequeath & devise to my children half Laura A. E. H. acwr all my property real & personal to be hers absolutely in fee simple in the foregoing my devises on & a lower officers on Maryret Street in this heirs form No. Ca. This January 5, 1926 - I also appoint my [...] [...] trustees with my hand.

                                                 Geo. H. Brown [Seal]
                                                 [...] H. Brown.

Witnesses:
Jennie Y [...] Ray
[...]
Anna B. Harding

We have signed this will of Geo. H. Brown in his presence as witness, and in his presence and in the presence of each other.

                                                 Anna B. Harding
                                                 [...]

GEO. A. PAUL
CLERK OF THE SUPERIOR COURT
BEAUFORT COUNTY
WASHINGTON, N. C.

IN RE WILL OF BROWN.

Last Will & Testament

of

George W Brown

of Beaufort County

No C.

Main Jany 5 1926

Brown

1926

...in my book
...among my valuable
papers this ...5-1926

Geo W Brown

...Ross

39—194

In re Will of Brown.

Geo H Brown

Last will &

Testament

Filed in this box with
my valuable papers
this January 5- 1926

Geo H Brown

After 5 days, return to
BANK OF WASHINGTON,
Lock Box 6,
WASHINGTON, N. C.

The powerful array of contentions by caveators was a *call of the blood* and negatived the *call of the wife.* The jury were instructed in the language of caveators' request, by a judge in whom, as a matter of common knowledge, all have confidence *"that it is the right and duty of the jury to consider them and to contrast the two alleged wills."* Not a *circumstance,* as the main opinion would indicate, but the *right and duty*—the definite duty. As said by a heroic Southern man, whose life was an inspiration, "Duty is the sublimest word in the English language." The caveators' request as given in the setting, was a call to the blood, and "my dear wife"—she who was "bone of my bones and flesh of my flesh," the helpmeet of over a half century—from the charge as given practically forgotten. The minds of the jurors, the triers of the facts, heard only the *duty* to the *call of the blood relations* in the charge as given, but penned by those representing the blood and adopted as the law by the able judge who tried the case. It was a charge that gave the widow little chance before a jury and, in my opinion, was erroneous in law and never before held to be law in this jurisdiction. In fact the use of the words *"merely a circumstance"* shows that this is as far as the majority of this Court will go now or in the future, yet they ignore the charge going further—*"right and duty,"* on the issue of mental capacity.

Arthur Mayo, referred to in the caveators' contentions, testified: "I am trying to help the caveators in this litigation; my interest lies that way." Then again: "I cannot believe that he was of sound mind when he made that will, considering all the circumstances (his reversal of previous statements). I think he was crazy. If he had given me the office in the will I could not say that I would have the opinion that he was of unsound mind. I probably would not." Yet the charge is the *right and duty* of the jury to consider the contentions as written by caveators and requested by them and make the *contrast.*

The following principle is well stated by *Justice H. G. Connor,* a jurist of learning and wide experience, *In re Peterson,* 136 N. C., at p. 27 (in 1904) : "In the light of the experience and observation of men of the best judgment and soundest minds, we can see nothing in the fact that this man gave his estate, the product of their joint industry and economy, to his wife, tending to show mental incapacity or undue influence. We do not think it tended to show either undue influence or mental incapacity. It seems, in the light of the testimony, the most natural and fitting expression of affection and solicitude of the testator."

It was testified to by all the witnesses that Judge Brown was a distinguished looking man. He had one of the greatest minds. His neighbor, Rev. S. A. Cotton, a witness for caveators, testified in part:

"I saw them together (speaking of his wife) a good many times; my observation led me to the conclusion that there was the usual ripeness and intensity of association you would expect to see between a couple of that age. I saw nothing in that respect except something to commend."

In the letter of Judge Brown, with request to destroy, which was used as a basis of a will, this great mind said, "God's will be done . . . I hope I may pass out quickly," but he tarried on, and who can tell that when he calmly looked to the end, this human mind found, a problem that puzzles the greatest minds, the call of *"my dear wife"* was greater than the call of the *blood relations*—the half century of life together—and he changed his mind and left all to his helpmeet. The *contrast,* as charged by the court below—*the right and duty* of the jury to consider it upon mental capacity, not *merely a circumstance,* as stated in the main opinion, was perhaps to them almost an instruction in favor of the caveators and a call of the blood, and they so decided. In my judgment it was error and prejudicial to the rights of the widow.

The inner sanctuary of this great jurist should not be forgotten. His wife testified: "During the last days of Judge Brown's life the intimacy of our associations could not have been closer than it was; he said to me, 'Laura, now that I know your real worth, I wish I could begin all over again.' We were sitting in the library together; he said 'I have worked so hard I wish I had a million to leave you.' . . . I had many conversations with him on spiritual matters, many such conversations, when I expressed my pleasure at his belief, I told him that I was glad that he believed. He said, 'I have always believed.' He had made it a practice for years—almost required it—to read the Bible in the morning, and during this illness he asked me every evening to go upstairs and read the Bible to him, which I did. Many times I repeated to him hymns he enjoyed very much hearing, and one especially, 'Sun of my soul, Thou Savior dear.' " Perhaps leaving the property to his helpmeet of half a century was the crowning human act of justice of this jurist—trusting her to do right to his blood. But we here are not the triers of fact. In this jurisdiction we can only pass on error in law. The family relation of husband and wife is sacred now and should ever be. The *contrast* in the charge, in my opinion, was prejudicial to the rights of the wife, and a new trial should be granted.